**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bill Craig BATES, Defendant-Appellant.**

**No. 78–5418.**

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1979.

As Modified on Denial of Rehearing
Sept. 21, 1979.

---

Dean Carlton, Dallas, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Archie Carl Pierce, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, CLARK and FAY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The appellant Bill Craig Bates was indicted for conspiracy to import marijuana into the United States, in violation of 21 U.S.C. § 963. His first trial ended with a hung jury, his second trial with a conviction. On appeal Bates challenges the admission of what he describes as "extraneous offense" evidence, claims error in two aspects of the court's jury charge, complains of the court's refusal to allow his defense attorney to testify in an attempt to impeach a government rebuttal witness, and asserts extravagant charges of prosecutorial misconduct against the Assistant United States Attorney who handled the case. We reject all of the appellant's contentions and affirm his conviction.

## I.

Bill Bates owned an island called El Cabo Rojo, or Sun Island, located in the Gulf of Mexico about 40 miles south of Tampico, Mexico. The government's case against Bates was that Bates agreed to join an ongoing conspiracy to import marijuana into the United States by providing his island as a refueling base for aircraft carrying marijuana from Mexico to Texas. The government's proof showed that two men, Benny Garrett and Frank Meece, organized and financed an enterprise for importing marijuana into central Texas. Garrett and Meece, along with a supporting cast of suppliers, pilots, ground crews, and airfield owners, were for several years actively engaged in importing marijuana from Mexico City, Guadalajara, Qaxaco and several other locations in Mexico. On some journeys, particularly those from the Mexican Pacific coast, the conspirators were having difficulty locating acceptable places to refuel their marijuana-laden aircraft, which were primarily single engine Cessnas. One of the pilots in the operation, Gary Dean Lewis, suggested Sun Island to his employers as an ideal refueling spot. It was agreed that Lewis should approach Bates about procuring the use of the island. In late February of 1976, Lewis met Bates in Houston and told him that he represented a group of people who would pay Bates $5,000 each time they used the airstrip on Sun Island to refuel aircraft transporting marijuana from Mexico. On April 10, 1976, Lewis and Garrett flew to Sun Island to explain the de-

tails of their proposed use of the island. Lewis would periodically bring fuel to Mexico in a DC–3, which he would divert to the island in the course of legitimate commercial charter flights. The stored fuel would then be used to refuel the single engine planes that would bring marijuana from Mexico. Bates agreed to the proposal. Several days later, Bates called Lewis and asked if he could receive the first $5,000 in advance of the initial flight. After consulting with Garrett, Lewis agreed to the advance, and on April 20, 1976, Garrett and Meece flew to Brownsville, Texas, and gave Bates $5,000. On May 7 or 8, 1976, Lewis flew to Sun Island and dropped off a load of fuel and a barrel pump.

The first actual use of the island was scheduled for later in that month. A load of marijuana was to be brought from the Mexico City area to Texas, with Sun Island as a refueling base. Mexican federal police, however, had begun to close in on the Mexico City airstrip that the conspirators had been using to load marijuana, and it was decided that it would be prudent to use a more remote loading spot on a dirt road near Cocolaco, Mexico. To locate the strip and arrange for the marijuana pickup there, Garrett procured the services of two unidentified fugitives who were fleeing prosecution on drug charges in the United States. The two fugitives, anxious to be taken out of the country, had seen the airstrip before and were to arrange to get the marijuana to the strip on behalf of the Garrett and Meece group. According to Lewis' testimony, Garrett, Lewis, another pilot named Dean Shute, and the two fugitives flew to Brownsville in late May to pick up Bates, and the entire group, including Bates, then flew to Mexico to drop off the fugitives and to view the landing strip. The fugitives had never seen the dirt landing strip from the air, however, and were unable to locate it. After leaving them in Mexico, the other conspirators refueled at Sun Island and eventually returned to Brownsville, empty handed. While clearing customs at Brownsville, Lewis found out that American authorities were investigating him with regard to a 5,000 pound load

of marijuana Lewis had delivered to Ft. Stockton, Texas, in his DC–3. That investigation eventually led to charges against Lewis, and as part of the plea bargain agreement on those charges, Lewis divulged the information he had concerning the Garrett-Meece operations, including his involvement with Bill Bates. Sun Island was thus never actually used by the conspirators on a "live" marijuana run from Mexico.

Bates took the stand on his own behalf. He admitted that he had been contacted by Lewis, and that Lewis had used his island as a refueling spot, but he denied that Lewis had ever spoken of the possible use of Sun Island for smuggling marijuana. Bates stated that another person, Jere Cobb, had made such overtures to him but that Bates told him that he absolutely refused to get involved in the marijuana business. Bates admitted that he did receive $5,000 from Garrett on April 20, 1976, in Brownsville, and that the transaction had been arranged by Lewis. Bates claimed, however, that the money was a loan from Garrett set up to help Bates through financial straits he was experiencing in trying to maintain the island. Bates also admitted that he flew with Garrett and Lewis into Mexico, but he denied that the purpose of the trip was to locate a clandestine airstrip. Bates asserted that he took the plane flight in order to have an opportunity to discuss legitimate business with Garrett.

Bates was found guilty by the jury at his second trial and was sentenced to two years' imprisonment, two years' special parole, and a $5,000 fine.

## II.

The indictment alleged that the conspiracy began November 1, 1975, and ran through November 14, 1977. The evidence showed that Garrett and Meece orchestrated and financed the ongoing smuggling enterprise, and that subordinate personnel such as pilots, ground crews, and air strip owners joined and left the operation at various times throughout its existence. Bates did not become involved until April of 1976.

Several government witnesses, including Garrett, Lewis and Cobb, testified to events concerning the smuggling operation that took place prior to the time that Bates allegedly joined the conspiracy. Garrett, Lewis and Cobb also made generalized references to their individual backgrounds in the marijuana importation business, references that included events antedating November 1, 1975. On appeal Bates raises four related allegations of error concerning this evidence, claiming that it was inadmissible "extraneous offense" evidence, that as a whole it constituted proof at variance with the offense charged in the indictment, that the court failed to instruct the jury that it must find an overt act in furtherance of the conspiracy *after* Bates joined it, and that the court erred in not submitting to the jury a charge concerning multiple conspiracies. The appellant's objections misapprehend both the Federal Rules of Evidence and the substantive law of conspiracy.

■ As the district court recognized, it is a misnomer to characterize the testimony concerning the acts and backgrounds of the co-conspirators as "extraneous offense" evidence. The testimony was not evidence of other crimes committed by Bates himself. *See* Fed.R.Ev. 404; *United States v. Beechum,* 582 F.2d 898, 902–903 (5th Cir. 1978) (en banc). Rather, the testimony was fully admissible evidence of the existence of an ongoing conspiracy as charged in the indictment. Nor was there anything improper in the brief references made by witnesses to their criminal behavior prior to joining the conspiracy. "Evidence of behavior antedating the period covered by the indictment is generally admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior." *United States v. Crockett,* 514 F.2d 64, 72 (5th Cir. 1975); *United States v. Nakaladski,* 481 F.2d 289, 296 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973).

■ The appellant's variance argument is premised on the erroneous assumption that Bates' relatively late entry into the Garrett-Meece smuggling operation somehow precludes his conviction as a participant in that conspiracy. The government presented overwhelming proof of a continuing smuggling enterprise utilizing various marijuana supply points in Mexico, several aircraft, numerous landing fields, and a division of labor among different support personnel. A single plan does not become many plans simply because some members were cast in roles more vital than others, or because certain members performed only a single function. *United States v. Michel,* 588 F.2d 986, 995 (5th Cir. 1979); *United States v. Becker,* 569 F.2d 951, 961 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). Nor does a single conspiracy become several merely because of personnel changes. *United States v. Michel, supra,* 588 F.2d at 995; *United States v. Scott,* 555 F.2d 522 (5th Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977). If Bates knowingly joined the ongoing conspiracy, it is immaterial that he may not have been privy to the details of each aspect of the operation; it is enough that he was aware of the conspiracy's general purpose and scope. *United States v. Becker, supra,* 569 F.2d at 961; *United States v. Brasseaux,* 509 F.2d 157, 160 (5th Cir. 1975). Had the conspiracy not been uncovered, the role of Bates and his island might have become critical to the operation's continued success. It makes no difference that those possibilities never reached fruition. The government's evidence amply supported Bates' knowing participation in an ongoing, large-scale smuggling conspiracy and there was no variance from the charge in the indictment. *See United States v. Brasseaux, supra,* 509 F.2d at 160–161.

■ The court instructed the jury that Bates could be found guilty only if some conspirator committed an overt act in furtherance of the conspiracy. The appellant claims that the court should have included a requirement that the jury find that the overt act took place after Bates joined the conspiracy. The dispositive answer to the appellant's contention is that no overt act

requirement exists for prosecutions under 21 U.S.C. § 963, the statute under which Bates was convicted. *United States v. Michel, supra,* 588 F.2d at 994; *United States v. Thomas,* 567 F.2d 638, 641 (5th Cir. 1978); *United States v. Palacios,* 556 F.2d 1359, 1364 n.9 (5th Cir. 1977). Because the general federal conspiracy statute, 18 U.S.C. § 371, does require an overt act, it is common for prosecutors, district courts, and courts of appeals to incorrectly assume the need to prove an overt act in prosecutions proceeding under 21 U.S.C. § 963, or its companion, 21 U.S.C. § 846. We have previously noted the prevalence of this confusion. *United States v. Thomas, supra,* 567 F.2d at 641; *United States v. Palacios, supra,* 556 F.2d at 1364 n.9. When an overt act instruction is mistakenly included in a prosecution under 21 U.S.C. § 846 or § 963, the error inures to the advantage of the defendant, for it shoulders the government with a greater burden than it rightfully bears. *United States v. Thomas, supra,* 567 F.2d at 641. Since Bates did not deserve an overt act instruction at all, he cannot complain that the benefits he received under that instruction were not as great as he would have liked.

 The appellant's final allegation of error concerning the court's charge to the jury is that the court failed to instruct the jury on the possibility that multiple conspiracies rather than a single conspiracy existed. The second paragraph of the instruction which Bates proffered on this subject was incorporated in the court's charge, verbatim. No objection was made to the jury instructions. Thus, reversal is warranted only if the charge as given constituted plain error. It must have been so egregious that it produced " 'the likelihood of a grave miscarriage of justice'." *United States v. Franklin,* 586 F.2d 560, 569 (5th Cir. 1978). Read in their entirety, the court's instructions fail to disclose any prejudicial error at all, and, actually, evidence generosity to Bates' cause. After giving an unchallenged instruction on the elements of the conspiracy—which, as noted before, gratuitously included the requirement of an overt act—the court gave a special instruction to the jury to the effect that if the jury had a reasonable doubt that the $5,000 Bates received from Garrett was a legitimate loan and not front money for the use of Sun Island, Bates should be acquitted. That special instruction gave to Bates even more than he could have received from a multiple conspiracy charge, for it focused on one specific event in the contacts between Bates and the other conspirators and required the jury to find that a nexus existed before returning a verdict of guilty. The appellant's belated objections to the court's instructions are unfounded.

### III.

The trial court refused to allow the appellant's defense counsel to testify in order to impeach the testimony of a government witness. As part of its rebuttal case, the government produced the witness, Glenn Horton, a person who had spent some time as manager of Sun Island under Bates. The gist of Horton's testimony was that Bates was in financial trouble with the island, and that Bates had discussed with him the possibility of alleviating those difficulties by permitting use of the Sun Island airstrip for marijuana smuggling. In surrebuttal, the defense offered the testimony of Bates' defense counsel, Mark Richman. Out of the jury's presence, the court heard Richman's proffered testimony and decided not to permit the defense attorney to testify. Richman's testimony was that he had witnessed a conversation between Bates and Horton in which Horton had said that if he were called to testify by a person named Ancira in an unrelated civil trial, Horton would agree to testify for Ancira and then when he got on the stand, would "fix his ass." It was the defense position that defense attorney Richman's testimony was crucial to undermining Horton's credibility.

 The trial court properly refused to allow Bates' defense counsel to testify. The conversation that Richman would have recounted had already been put before the jury during the defense's rigorous cross-ex-

amination of Horton. Horton was asked whether he had stated to Bates and Richman that he "would agree to play along with Mr. Ancira in his suit and get on the stand for Mr. Ancira and then double cross him when we came in to cross-examination." The question was repeatedly put to Horton in various forms and with heightening sarcasm, and Horton's general credibility and bias toward Bates was thoroughly explored throughout the examination. Richman's testimony would have added nothing concerning the defense lawyer's version of Horton's story that was not obvious from the prior cross-examination. *See United States v. Brown,* 417 F.2d 1068, 1069 (5th Cir. 1969). *Cf. United States v. Sadler,* 488 F.2d 434 (5th Cir. 1974). Courts are reluctant to allow advocates participating in a trial to take the witness stand. *United States v. Brown, supra,* 417 F.2d at 1069. The decision is entrusted to the sound discretion of the trial judge. *Travelers Insurance Co. v. Dykes,* 395 F.2d 747, 749 (5th Cir. 1968). The opportunity to impeach a witness during cross-examination, even when that opportunity is not capitalized on, has been held sufficient to justify barring a defense attorney's testimony. *United States v. Brown, supra,* 417 F.2d at 1069. Where, as here, cross-examination was used to present the same story that the attorney would have told, the court was well within the permissible bounds of its discretion in not allowing the defense attorney to take the stand.

### IV.

The appellant has leveled charges of egregious misconduct against the Assistant United States Attorney who prosecuted the case against him. If true, the charges would mandate reversal of the conviction and provide a basis for disbarment of the prosecutor and even his possible prosecution for obstruction of justice. A careful review of the record reveals that the assertions of misconduct are utterly unsubstantiated. The allegations are extravagant interpretations of record excerpts quoted selectively and out of context. Though we might excuse a criminal defendant's animosity to-

ward the man that prosecuted his case, and overlook the minor embellishments of a defense attorney vigorously defending his client, we condemn the cavalier and reckless allegations made by the appellant's counsel here. We recount in detail the allegations and their alleged "support" in the record only to expose their complete lack of merit.

At the outset we dispose of the appellant's contention that the trial court should have conducted a separate pretrial evidentiary hearing to explore the allegations of prosecutorial misconduct. Evidentiary issues bearing on possible prosecutorial misconduct should normally be reserved for trial, and should not be determined on a pretrial motion to dismiss. *United States v. Miller,* 491 F.2d at 638, 647 (5th Cir. 1974); *see also United States v. Knox,* 396 U.S. 77, 83, 90 S.Ct. 363, 367, 24 L.Ed.2d 275 (1969). The charges of misconduct in this case all concerned alleged efforts by the prosecution to tamper with the testimony of witnesses; they presented precisely the sort of factual questions best reserved for trial. The trial court therefore acted correctly in not conducting a separate evidentiary hearing at the pretrial stage.

The appellant claims that the prosecutor intimidated, coerced and induced potential defense witnesses not to testify for Bates or to change their statements to favor the government. The appellant's first specific allegation is that the prosecution pressured a friend of Bates named Robert Clark not to testify at Bates' second trial. Clark, who testified at Bates' first trial, was a prisoner at the federal minimum security prison at Seagoville, Texas, the same prison at which the government's witness, Gary Lewis, was incarcerated. Clark testified that Bates had periodically visited him while Clark was at Seagoville, and that during one such visit Bates also met with Lewis. Clark stated that he heard Lewis tell Bates that Lewis was willing to provide an affidavit on Bates' behalf to the effect that the $5,000 received by Bates in connection with the Sun Island activity was a loan made for reasons unrelated to marijuana

smuggling. On cross-examination Clark admitted that he was unaware that prior to the date of the conversation at Seagoville between Lewis and Bates, Lewis had already given sworn statements to DEA agents implicating Bates. Clark did not testify at Bates' second trial. The appellant's sole evidentiary support for the allegation that Clark's failure to testify at the second trial was the result of prosecutorial pressure is a brief excerpt from Clark's testimony at the first trial, in which Clark stated that a building supervisor at Seagoville had told him that if he had "any feedback, any rumbles of any kind that [Clark] was involved with any situation regarding Mr. Lewis, that they'd have [Clark] shipped immediately into Texarkana," a maximum security prison. By quoting this one brief slice of Clark's testimony out of context, Bates attempts to substantiate the claim that Clark was threatened that if he testified for Bates he'd be punished. In fact, the record establishes that the "rumbles" referred to by Clark had nothing to do with whether Clark testified for Bates but rather with Clark's attempts to persuade Lewis to do so. Lewis was under pressure from Clark to help Bates, but unknown to Clark, had already implicated Bates in statements to the DEA. Lewis did not want Clark or other prisoners to know of his assistance to the government. Prison officials and the DEA agent in charge of Bates' case let Lewis know that if Lewis felt he was in danger from Clark, either Lewis or Clark could be transferred to Texarkana. Lewis did not want to be transferred for fear that it would indicate to other prisoners that he was a government informer, and it was the threat that Clark would therefore be the one transferred that reached Clark's ears. Ultimately, neither prisoner was transferred. Clark, in his own testimony, admitted that the threat of transfer arose from Clark's interference with Lewis. Clark further testified unequivocally that he had never been threatened in any way by the prosecutor, by DEA agents, or by prison officials.

Relying a second time on the incidents at Seagoville between Clark, Lewis and Bates, the appellant makes the assertion that Lewis had "repeatedly averred" that Bates was innocent and that "the prosecutorial team deliberately instructed Lewis to mislead the defendant and defense counsel and to thereafter change his story to favor the government." Once again, the only misleading that has occurred is in the appellant's allegation and his interpretation of the record references that allegedly support it.

Even using the appellant's own selective record references, the story that emerges is exactly opposite to that claimed. Far from "repeatedly averring" that Bates was innocent, Lewis repeatedly refused to sign an affidavit attesting to Bates' innocence that had been prepared by Bates, and far from being pressured by the government, Lewis was told by his own attorney not to sign Bates' affidavit. Lewis did, on his own attorney's advice, string Bates along by never telling Bates outright that he would not sign the affidavit. That tactic, however, was devised to protect Lewis while he was in prison, since an outright refusal to help Bates would be a sign to other prisoners that Lewis was helping the government.

The appellant next claims that the government induced Garrett to change his story regarding Bates. Garrett had told Bates at their arraignment not to worry because Garrett would say that the $5,000 given Bates was a loan. Garrett later testified at Bates' trial that the money was payment for the use of Sun Island as a refueling point for the smuggling operation. The inconsistency between these two statements was fully exposed at trial; Garrett's explanation was that at the time of arraignment Garrett thought, in his words, that: "we were all going to trial. And I am not a snitch." Inconsistency in a witness' story, particularly the story of a sophisticated dealer in the importation of marijuana such as Garrett, is no proof at all of prosecutorial tampering. Garrett's motives were brought out at trial, and nothing else in the record remotely suggests that his change of tune was at the government's behest. Yet with no more to go on than this, the appellant's counsel asserts on this

appeal that the prosecutor suborned perjury.

The appellant's last allegation of misconduct is in some respects his most extravagant, for it claims, without any citation to any supporting evidence, that the defense counsel was denied access to Jere Cobb, a potential defense witness. The record reveals, however, that Cobb testified in both of the appellant's trials. His testimony covered all relevant areas concerning Bates' connection to the conspiracy, and was favorable to Bates.

AFFIRMED.