**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Isidro Sanchez OCHOA, Omar Sanchez Ochoa, Reynaldo Fuentes Ortega, and Juanita Alaniz Cavazos, Defendants-Appellants.**

**No. 79–5079.**

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1980.

---

Alfonso A. Guerra, McAllen, Tex. (Court-appointed), for I. Ochoa.

Oscar Palacios, Pharr, Tex. (Court-appointed), for O. Ochoa.

Robert Gaines Griffin, Weslaco, Tex. (Court-appointed), for Ortega.

Ramon Garcia, Edinburg, Tex., for Cavazos.

John M. Potter, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEWIN, AINSWORTH and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Four defendants convicted of distribution and conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 bring

this appeal to urge various grounds of complaint: improper use of informants, multiple rather than a single conspiracy, insufficiency of the evidence, and erroneous rulings on the admissibility of evidence. The first contention is frivolous. We overrule the other complaints and affirm the convictions of Isidro Ochoa, Omar Ochoa and Reynaldo Ortega. We reverse the conviction of Juanita Cavazos because of improperly admitted evidence.

## FACTS

This case arises out of an undercover investigation by the Drug Enforcement Administration in McAllen, Texas, from August 21 to September 16, 1978. Two informants, Roberto Ortiz and Enrique Marroquin, assisted DEA agent Russell Reina in establishing the necessary contacts. Seven individuals, including one John Doe, were indicted on six counts.[1] Count one is the general conspiracy count with which all defendants were charged. Defendant Salazar pleaded guilty to the conspiracy count and all other charges were dismissed; he does not appeal. All charges against defendant Anzaldua, Salazar's common-law wife, were dismissed in return for cooperation. The remaining four defendants, Isidro Ochoa, Omar Ochoa, Reynaldo Ortega, and Juanita Cavazos were each found guilty of count one as well as the counts corresponding to their substantive offenses.

On August 21 agent Reina, informant Ortiz and defendants Isidro Ochoa and Omar Ochoa met in the Windsor Motel in McAllen to discuss a sale of heroin. Agent Reina gave informant Ortiz money for the purchase. Informant Ortiz left with the Ochoas and later returned to the motel with Omar Ochoa and the heroin. Thirty dollars was paid for .17 grams of heroin.

On August 23 agent Reina, informant Ortiz, and defendants Omar Ochoa and Reynaldo Ortega met at the motel and discussed another sale. Later that day agent Reina paid defendant Ortega $500.00 for 4.6 grams.

On August 31, informant Ortiz arranged another meeting between agent Reina and defendant Ortega. Later that day agent Reina purchased 27.8 grams for $1500.00 from defendant Ortega and a John Doe.

On September 12 informant Marroquin, defendants Omar Ochoa, Jesus Salazar and unnamed others met to discuss agent Reina's purchase of more heroin.

On September 14, agent Reina and defendant Ortega discussed a heroin sale shortly before a meeting which informant Ortiz had arranged between agent Reina and defendant Salazar. Defendant Salazar suggested a sale of heroin; agent Reina, Salazar and Salazar's wife, Yolanda Anzal-

1. The indictment in this case charged, in count one, a conspiracy among Armando Salazar, Reynaldo Ortega, Juanita Cavazos, Yolanda Anzaldua, Omar Ochoa, Isidro Ochoa and John Doe to possess with intent to distribute, and to unlawfully distribute a quantity of heroin, a controlled substance under Schedule I of the Controlled Substances Act of 1970, in violation of 21 U.S.C.A. §§ 846, 841(a)(1). The conspiracy is alleged to have occurred from on or about August 21, 1978 to on or about September 16, 1978.

Five overt acts were alleged which roughly correspond to the remaining counts of the indictment. On August 21, Omar Ochoa and Isidro Ochoa are alleged to have met with an undercover agent of the Drug Enforcement Administration at the Windsor Motel in McAllen, Texas. In count two, Omar and Isidro Ochoa are charged with distributing .17 grams of heroin in violation of 21 U.S.C.A. § 841(a)(1).

On August 23, Omar Ochoa and Reynaldo Ortega are alleged to have met with the under-

cover agent at the Windsor Motel. In count three, Omar and Ortega are charged with distributing 4.6 grams of heroin.

On August 31, Reynaldo Ortega and John Doe allegedly met at Dairy Queen located on 501 North 10th in McAllen, Texas. In count four, they are charged with distributing one ounce of heroin. (John Doe has never been identified or arrested.)

On September 14, Armanda Salazar and his wife, Yolanda Anzaldua, met with the undercover agent in front of 108 East Saenz Street, Pharr, Texas. In count five, Salazar, Anzaldua and Juanita Cavazos are charged with distributing approximately two ounces of heroin.

On September 16, Salazar, Anzaldua and Cavazos are alleged to have met in Room 21 of the Windsor Motel. In count six, they are charged with possessing with intent to distribute approximately five and one-half ounces of heroin.

dua, drove to a store where defendant Cavazos worked. Salazar went inside for a few minutes. Then, Reina, Salazar, and Anzaldua drove to Cavazos' residence in Pharr, Texas. Salazar entered the house through the front door, shortly emerged and sold agent Reina 49.7 grams for $2500.00. Later that afternoon, agent Reina discussed another transaction with Salazar. As Reina was leaving, defendant Ortega arrived for further discussions with Salazar.

On September 15 agent Reina again discussed a heroin sale with Salazar.

On September 16 agent Reina discussed a sale with the Salazars. After arriving at their apartment in the Windsor Motel, Reina was informed that Anzaldua would place a telephone call for delivery of the heroin. Shortly thereafter defendant Cavazos arrived at the Salazars' apartment. While waiting for this delivery, agent Reina saw defendant Ortega in the courtyard of the motel and arranged for a purchase of heroin from him later that afternoon at the Cuevas Restaurant in McAllen, Texas. Agent Reina and informant Marroquin then entered the Salazars' room. Agent Reina agreed to buy 135.8 grams of heroin for $6200.00 from Salazar. In the one room efficiency apartment with Salazar at that time were Salazar's wife and defendant Cavazos. Agent Reina then left the apartment, supposedly to get the money for the heroin, but instead alerted other narcotics agents who assisted him in arresting all three defendants. Later that day defendant Ortega was arrested at the Cuevas Restaurant.

## SINGLE CONSPIRACY

Defendants attack the sufficiency of the evidence supporting the jury's finding of a single conspiracy. "To prove a conspiracy, the government must prove the existence of an agreement between two or more persons to combine efforts for an illegal purpose. Direct proof of an agreement is not necessary to establish a conspiracy; it may be proven by inferences from the actions of the actors or circumstantial evidence of the scheme." *United States v. Hitsman,* 604 F.2d 443, 446 (5th Cir. 1979); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). "Whether a scheme is one conspiracy or several is primarily a question for the jury." *United States v. Michel,* 588 F.2d 986, 995 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Rodriguez,* 509 F.2d 1342, 1348 (5th Cir. 1975). "A single plan does not become many plans simply because some members were cast in roles more vital than others, or because certain members performed only a single function." *United States v. Bates,* 600 F.2d 505, 509 (5th Cir. 1979); *United States v. Michel, supra.*

The evidence warranted the finding that each of the defendants were aware of the conspiracy and voluntarily associated with it. In an attempt to satisfy agent Reina's desire for increased amounts of heroin, some defendants introduced agent Reina to other defendants in a stepladder progression. Thus, informant Ortiz introduced agent Reina to the Ochoa brothers for the initial purchase of a small sample of heroin. The jury heard testimony that Isidro was having trouble reestablishing his connections for heroin. (R. at 127). Because of Isidro's difficulties and perhaps because the group was fearful of losing Reina as a customer, Omar Ochoa subsequently introduced Reina to defendant Ortega for additional heroin purchases. As Reina's needs began to outstrip Ortega's resources, defendant Ortega and defendant Salazar agreed to work together to supply Reina with larger quantities of heroin. Finally, defendant Salazar and defendant Cavazos cooperated to supply Reina with the largest amounts of heroin.

A finding of a single conspiracy is not defeated merely because of personnel changes. *United States v. Bates, supra,* 600 F.2d at 509. On the contrary, we have recognized proof of overlapping membership and activities directed toward a common goal as factors reflecting only one conspiracy. *United States v. Michel, supra,* 588 F.2d at 994–95; *United States v. Becker,*

569 F.2d 951, 960–61 (5th Cir. 1978), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). As noted above, Isidro and Omar Ochoa worked together to supply agent Reina with heroin, as did Omar Ochoa and Ortega, Ortega and Salazar, and Salazar and Cavazos. Furthermore, Salazar was aware of agent Reina's transactions with Omar Ochoa and with Reynaldo Ortega (R. at 154); Ortega was aware of Reina's transactions with Salazar. (R. at 151, 164). The interrelated nature of the enterprise is further reflected by the fact that on September 12, Salazar, Omar Ochoa and unnamed others met to discuss agent Reina's continued purchases of heroin. (R. at 153).

Even when not acting in each other's presence, these defendants operated in similar fashions, further evidence of a common plan. Heroin is rarely sold in its pure state, but is diluted with various materials. All of the heroin purchased by agent Reina during the course of this investigation contained quantities of acetylprocane greater than one percent. According to the government's expert witness in analytical chemistry, this relatively high percentage of a single cutting material indicated a similar method of operation. (R. at 108, 111).

A similar method of operation is also demonstrated by the manner in which each of the transactions were conducted. In each instance the heroin was located elsewhere during the negotiations and had to be delivered after agreement had been reached. Defendants would first meet with agent Reina, satisfy themselves that he was ready to buy and agree on a price. All parties would then proceed to another location, or the heroin would be brought to the parties, for the actual transfer.

■ In view of the foregoing evidence showing the interrelationships among these defendants, their joint activities and similar methods of operation, we find support for the jury finding of a single conspiracy.

## ISIDRO OCHOA

Defendant Isidro Ochoa contends the evidence supporting his conviction was insufficient. An examination of the testimony of agent Reina and informant Ortiz adequately refutes that contention. During joint negotiations with agent Reina, Omar Ochoa identified his brother Isidro as their heroin "connection," (R. at 121), a designation which Isidro did not deny. In response to agent Reina's concerns over the length of time the sale would take, Isidro stated that he was having difficulty reestablishing himself in the "business" and required payment in advance. (R. at 127). In Isidro's presence, agent Reina gave informant Ortiz a one hundred dollar bill for the express purpose of buying heroin. (R. at 122–23). Isidro injected that he had only arranged for a sample which would cost $30.00 (R. at 123, 452). Therefore, when Ortiz and the Ochoa brothers left the motel they proceeded to a local grocery store where Ortiz obtained smaller denominations for his hundred dollar bill. Informant Ortiz testified that Isidro procured the heroin which he handed to Omar who then gave it to Ortiz. (R. at 83). Although only Omar Ochoa and informant Ortiz returned to the motel, Omar answered agent Reina's displeasure at the length of time the transaction had taken by reiterating that Isidro had arranged for the heroin. (R. at 127, 246).

■ The evidence showed and the jury was justified in concluding that Isidro and Omar Ochoa operated together, a conclusion naturally reinforced by their familial relationship, and that Isidro had played an active, if not a dominant, role in the August 21 transaction. Again, a defendant may be convicted for participation in an illegal conspiracy despite the fact that he performs only a single function or is later replaced by others. *United States v. Bates, supra,* 600 F.2d at 509; *United States v. Michel, supra,* 588 F.2d at 995. It is not necessary for Isidro to know each of the other coconspirators or be privy to the details of each enterprise comprising the conspiracy so long as he knows of the conspiracy and associates himself with it. *United States v. Carter,* 603 F.2d 1204 (5th Cir. 1979); *United States v. Harbin,* 601 F.2d 773, 781 (5th Cir. 1979); *United States v. Rodriguez, supra,* 509 F.2d at 1348. Viewing the evidence in the light

most favorable to the government, *Glasser v. United States, supra,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accepting all reasonable inferences and credibility choices that support the jury verdict, *United States v. Wieschenberg,* 604 F.2d 326, 330 (5th Cir. 1979), we find substantial evidence to sustain Isidro Ochoa's conviction on both the conspiracy and the substantive counts.

## JUANITA CAVAZOS

Defendant Cavazos raises a number of grounds on appeal. Although we find sufficient evidence to support her conviction, we reverse for a new trial because of evidence improperly introduced which was prejudicial to Cavazos' rights.

### A. *Sufficiency of the Evidence.*

■ Although the evidence against Cavazos is largely circumstantial, circumstantial evidence may serve as the basis for a conviction. *United States v. Michel, supra,* 588 F.2d at 994. When viewed in the light most favorable to the government, the evidence showed Cavazos to be both present and aware of the largest heroin transaction, and implicated as the heroin source for one, and possibly two, transactions with agent Reina.

The evidence showed that on September 14 agent Reina engaged in a heroin deal with Salazar and Anzaldua. After Salazar and Reina had agreed on both the price and quantity of heroin, Salazar asked Reina to follow him to another location for the actual transfer. Reina followed Salazar to the King Mart Grocery Store in McAllen, a store in which defendant Cavazos often worked. Salazar entered the store but quickly returned, whereupon he drove to Cavazos' residence at 108 Saez Street in Pharr, Texas. Defendant Cavazos lived at that address with her two daughters and son. Government agents maintaining surveillance of Salazar noted a light green Ford Mustang, Texas license FNB–23, registered to Cavazos' daughter, parked in front of the residence when Salazar and Reina arrived. Although Cavazos testified that Salazar had gone to her house that afternoon to fix the Mustang, government agents testified that Salazar neither opened the hood nor tinkered with the car in any manner. Instead, Salazar entered the house through the front door, and on emerging sold approximately two ounces of heroin to agent Reina.

On September 16 agent Reina agreed to meet Salazar and Anzaldua at their apartment in the Windsor Motel for another heroin transaction. Shortly after Reina arrived, Anzaldua informed him that she had just called to have the heroin delivered. Approximately ten minutes later, the same 1966 Ford Mustang seen two days earlier at Cavazos' house arrived and parked almost directly in front of the Salazar's apartment. Salazar then informed agent Reina that the heroin had arrived, and Reina entered Salazar's small efficiency apartment. A four inch wide, waist high counter divided the kitchen area, where Salazar and Reina negotiated, from the bedroom area. Defendants Cavazos and Anzaldua were both on the bed, fifteen to twenty feet from the counter, playing with Anzaldua's infant, and remained there throughout Reina's visit. Salazar, who was to sell Reina five and one-half ounces of heroin, stated that he had just weighed the heroin. At Reina's request, the heroin was reweighed. Salazar walked towards the bathroom where he used both hands to pick up and return with an eighteen inch high, three-beam precision scale. Agent Reina testified that he and Salazar conversed in normal tones, not whispers, while the heroin was reweighed and the sale finalized, so the jury would be justified in concluding that defendant Cavazos could hear and was aware of the negotiations.

■ When the deal was finalized to everyone's satisfaction, Reina left the Salazars' apartment, supposedly to get the money, but instead, alerted other government agents who assisted him in arresting Salazar, Anzaldua and Cavazos. Defendant Cavazos had the keys to the green Mustang at the time of her arrest. We hold there was sufficient evidence to warrant a jury in finding Juanita Cavazos to be a knowing and voluntary participant in this conspiracy.

B. *Cross-examination of Cavazos: Evidence of Bad Conduct of Kin and Associate.*

Defendant Cavazos presented two witnesses who testified to her good character in the following respects: she was "truthful," an "outstanding" employee, an "excellent" worker, "very dependable," "works without supervision," "very efficient," "a very dedicated mother," "very close to her family," "very close to her children," and "a very nice lady." Both of these witnesses were cross-examined by the prosecution.

Defendant Cavazos then took the stand to testify in her own defense. She presented a general background sketch which included the fact that she had lived in Indiana at the house of her brother, Manuel Alaniz. (R. at 382). She also stated that it was through her friend, Molly Paz, that she came to know codefendant Yolanda Anzaldua. (R. at 396). Finally Cavazos related the events of September 14 and September 16 and denied any complicity in the heroin transactions on those dates.

Prior to cross-examination, Cavazos presented an oral motion in limine to prevent the government from inquiring into the bad conduct of her brother, Armando Alaniz, brother-in-law, and friend, Molly Paz. The motion was overruled and on cross-examination Cavazos was required to testify that her brother-in-law had been "in trouble with the law for drugs" (R. at 412–13), that Molly Paz had been "in trouble with the law" (R. at 414–15), and that one of her five brothers, Armando Alaniz, had been convicted for conspiracy to import marijuana. (R. at 415). Cavazos contends that the admission of these convictions was highly prejudicial as it tended to show her guilty of the crimes charged by her kinship to or association with disreputable people.

We find no justification for this cross-examination. Under Federal Rule of Evidence 404(a)(1),[2] the government was restricted to rebutting the character testimony of Cavazos' witnesses. Questions concerning the bad conduct of Cavazos' family and friend were not germane to any character testimony presented in her behalf.

The government contends that defendant Cavazos opened herself to this cross-examination. The general rule with respect to cross-examination of a criminal defendant comes from *Brown v. United States*, 356 U.S. 148, 157, 78 S.Ct. 622, 628, 2 L.Ed.2d 589 (1958), in which the Court stated that "by her direct testimony she [defendant] had opened herself to cross-examination on the matters relevantly raised by that testimony." *See also McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated in part on other grounds*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972). In this case, Cavazos testified on direct that she had lived with her parents at the house of her brother, Manuel Alaniz, seventeen years before the incidents alleged in the indictment, and that she had met Anzaldua through her friend, Molly Paz. Cavazos never referred to her brother, Armando Alaniz, who had been convicted for conspiracy to import marijuana, or her brother-in-law, and on cross-examination denied ever having lived with her brother-in-law and sister. Nonetheless, on cross-examination the government was allowed to bring out the prior convictions of Molly Paz, Armando Alaniz, and Pedrazo Sanchez, Cavazos' brother-in-law. Of these three people, only Molly Paz had been mentioned on direct, and even then, the reference was limited.

Cavazos never testified that any of these people were good people or placed their character in issue in any manner. This is not a case in which the defendant opened the door on direct and can now be required

2. Federal Rule of Evidence 404 provides in relevant part:

(a) *Character evidence generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of showing that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same  .  .  . .

to give full details, *United States v. Palmer*, 536 F.2d 1278, 1282–83 (9th Cir. 1976); *Branch v. United States*, 84 U.S.App.D.C. 165, 166, 171 F.2d 337, 338 (D.C.Cir. 1948), or in which a matter left unclear on direct was to be clarified on cross-examination. *United States v. Crawford*, 438 F.2d 441, 444 (8th Cir. 1971). There was no evidence and no implication that any of these individuals were associated in any manner with this drug conspiracy. Their conduct was not relevant to any of the issues in this prosecution.

In *United States v. Caron*, 474 F.2d 506 (5th Cir. 1973), the defendant, charged with giving false testimony before a grand jury by denying that he was a bookmaker, testified in his own defense and categorically denied that he was a bookmaker or engaged in bookmaking operations. On cross-examination, the court allowed the introduction of evidence showing defendant's dealings with another bookmaker though it was collateral to the issues raised by the indictment and for which defendant was on trial. In the case at bar, Cavazos, on direct, simply related her activities on September 14 and September 16, dates on which she allegedly distributed heroin. She gave no testimony that she had never known or associated with drug dealers. Her mention of one of her brothers and friend was merely in the context of a general background sketch of her life. Cavazos never opened the door for the introduction of the convictions of her associate and kin.

In cases analogous to the situation in the case at bar, this circuit has held the admission of evidence of bad conduct of relatives or friends to be error. In *United States v. Vigo*, 435 F.2d 1347 (5th Cir. 1971), *cert.*

denied, 403 U.S. 908, 91 S.Ct. 2214, 29 L.Ed.2d 684 (1971), for example, the court held cross-examination of a defendant, charged with a narcotics violation, with respect to the prior heroin conviction of her husband warranted reversal despite the fact that defendant had denied knowing anyone who had been convicted of violating narcotics laws. The court stated:

We are simply dealing with the question of whether such damaging proof can be introduced by cross examining the defendant where neither the question nor the answer given upon cross examination is inconsistent in fact with anything previously testified to by the defendant and, thus, is not, in fact, relevant to the issue of the credibility of the defendant as a witness in her own behalf.

*Id.* at 1351. In *United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978), the court held cross-examination of defendant (charged with violating federal gun laws) as to whether his son had been arrested for possession of stolen guns to be improper, despite the fact that defendant and his son were observed counting money outside a bar after an illegal sale of a revolver to a federal agent. The court stated: "A conviction of defendant's son on that charge was irrelevant to any issue in this case, let alone a mere arrest. This was a highly prejudicial attempt to taint defendant's character through 'guilt by association'". *Id.* at 109. This practice of the Fifth Circuit of excluding the convictions of associate and kin in cross-examination of a defendant is consistent with the practice in other circuits.[3]

■ We therefore hold that the introduction of the extraneous offenses of Cavazos'

**3.** The Second Circuit in *United States v. Turcotte*, 515 F.2d 145 (2nd Cir. 1975), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975), held that cross-examination of a defendant charged with making a false declaration to a grand jury as to whether his girlfriend had been convicted for cashing harness racing tickets under a false name to be improper. The court held that the trial court had properly sustained an objection to the cross-examination. *Id.* at 152. In *United States v. Gosser*, 339 F.2d 102, 112 (6th Cir. 1964), *cert. denied*, 382 U.S. 819, 86 S.Ct. 44, 15 L.Ed.2d 66 (1964), the Sixth Circuit stated that a defendant's credibility as a witness could not be "attacked by evidence of prior arrests without convictions or association with convicted felons or gamblers." *See also United States v. Crawford*, 438 F.2d 441 (8th Cir. 1971), in which the Eighth Circuit found cross-examination of a defendant charged with the sale of cocaine and heroin as to his association with convicted narcotics felons to be reversible error.

brother, brother-in-law, and friend constituted error prejudicial to Cavazos' right to a fair trial.

C. *Hearsay Testimony by Government Agent.*

During the examination by the government, agent Reina testified that Salazar had said Cavazos brought the heroin over to the apartment on September 16. When Reina gave that testimony apparently neither the judge nor the defense attorney realized that Reina was referring to what he had been told that Salazar said in court in the course of his support of his guilty plea—double hearsay inadmissible on any basis.

Defense counsel unsuccessfully argued to the judge in the trial below, and pursues on appeal, his right to impeach Salazar's statement by proof of Salazar's plea bargain. This argument need not be considered because the problem will not arise at the retrial. Suffice it to say that Reina's highly prejudicial hearsay testimony went to the jury as evidence without any limitation as to its weight or admissibility and thereby reinforces our decision that Cavazos did not obtain a fair trial.

The convictions of defendants Isidro Ochoa, Omar Ochoa, and Reynaldo Ortega are affirmed. The conviction of Juanita Cavazos is reversed; as to her the cause is remanded for retrial.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.