**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph R. DeLUCCA, Julio Enrique
Perez, Jr. and Manuel Pozo,
Defendants–Appellants.**

No. 79–5542.

United States Court of Appeals,
Fifth Circuit.

Nov. 10, 1980.

Rehearings Denied Dec. 24, 1980.

---

Neal R. Sonnett, Benedict P. Kuehne, Miami, Fla., for DeLucca.

J. Stephen Salter, Benjamin Daniel, Birmingham, Ala., for Perez.

Richard H. Bite, Birmingham, Ala., (Court–Appointed), for Pozo.

Bill L. Barnett, Asst. U. S. Atty., Birmingham, Ala., for the U. S.

Before VANCE and GARZA, Circuit Judges, and ALLGOOD\*, District Judge.

ALLGOOD, District Judge:

On May 9, 1979, a federal grand jury sitting in the Northern District of Alabama indicted five defendants in connection with a drug conspiracy in Birmingham. The co–defendants were Joseph DeLucca, Julio Perez, Manuel Pozo, Emilio DeLa Rosa and Kenneth Brown. Each of the defendants was charged with one count of conspiracy to distribute cocaine,[1] and two substantive counts of possession with intent to distribute[2] and distribution of cocaine.[3] A motion to disclose the identity of the government informer was filed by each of the defendants and the United States Magistrate denied the request, stating that the identity of the informer was known to the defendants.

A jury trial commenced on August 13, 1979. During the afternoon of the fourth day of the trial, the government moved to dismiss defendant Brown in the presence and hearing of the jury. The motion was granted without objection from any of the remaining defendants. The following morning, prior to the resumption of the testimony, with the jury present in the jury box, the government moved to dismiss defendant DeLa Rosa. This motion was also granted, after which DeLucca and the other defendants moved for a mistrial. The defendants' motion was denied and the trial continued as to the remaining defendants.

After the government rested its case, the court *sua sponte* dismissed the substantive counts against DeLucca. The jury, thereafter, found each of the defendants (including DeLucca) guilty of the charges against them. The defendants now appeal their convictions and sentences. Although this appeal raises several issues which merit our serious attention, we can find nothing in the record to indicate that reversible error was committed. Therefore, we affirm the convictions.

I. *Facts*

During March and April of 1979, Ed Bagley became unwittingly involved in an elaborate drug operation, which was centered around the Miami, Florida area. Bagley was having financial difficulty and was desperately in need of a large sum of money. He learned from Kenneth Brown, a friend of his, that a lawyer in Miami by the name of Joseph DeLucca might be able to help him. DeLucca was Brown's brother–in–law and had several clients in and around the Miami area. He agreed to meet with Bagley and arrangements were made for Bagley to fly to Miami.

Around the first of March, 1979, DeLucca met Bagley at the Miami airport. From

---

\* District Judge of the Northern District of Alabama, sitting by designation.

1. In violation of 21 U.S.C. § 846.

2. In violation of 21 U.S.C. § 841(a)(1).

3. In violation of 21 U.S.C. § 841(a)(1).

there, they drove around for about an hour, at which time DeLucca asked Bagley if he would mind taking a risk. The subject was dropped for the time being and they proceeded to meet with a client of DeLucca's, Manuel Pozo. Pozo owned a tire store, as did Bagley in Birmingham. The trio rode around in DeLucca's car for approximately an hour and it was at this time that Pozo first approached Bagley about selling some cocaine in Birmingham. Although Bagley was somewhat nonplussed by the idea, he agreed to continue the discussion with Pozo later on that afternoon.

The meeting failed to materialize, but they were able to discuss the cocaine deal in greater detail that night at DeLucca's home. In addition to the trio, another man, later identified as Julio Perez, was present for the discussion. After being tutored in the specifics of cocaine, Bagley was given a sample to take back to Birmingham with him. It was established at the meeting that the group was interested in negotiating a substantial cocaine transaction in the Birmingham area.

Before boarding a plane back to Birmingham, Bagley threw away the cocaine sample. After returning to Birmingham, he called DeLucca to see about trying to work out a sale of tires to South America. Mr. DeLucca said that he did not know anything about the South American market and, therefore, could not help him. It was at this time that Bagley decided that, rather than enter into the illegal scheme, he would contact the Drug Enforcement Agency (D.E.A.). He did so, and agreed to assist the agency in their investigation of the cocaine operation, with the understanding that he would be paid for his services. Thereafter, Bagley went back to Miami for the purpose of setting up a cocaine transaction between Pozo and D.E.A. agents. A large deal was anticipated, which Pozo could not handle, so Bagley called DeLucca for suggestions. DeLucca arranged for Perez to contact Bagley, because he was better situated to handle larger quantities. Perez and Bagley discussed the specifics of the deal and decided to set up a small sale in Birmingham. This sale was to be followed by a larger one if it proved successful.

The small sale was consummated in Birmingham between Perez and two D.E.A. agents on April 15, 1979. Perez exchanged his sample of cocaine for $27,500.00. Three days later, a larger deal, which involved approximately $250,000.00 worth of cocaine, was arranged. By this time, Perez's bodyguard, DeLa Rosa, had joined him. They met with one of the agents in a Birmingham motel room. When Perez produced the cocaine, he and DeLa Rosa were arrested.

Appellants have raised several questions for our consideration. Two issues which are of particular concern to us are the government's motions to dismiss and the sufficiency of the evidence.

## II. *The Government's Motions to Dismiss*

Prior to the start of the afternoon session on the fourth day of the trial, the government requested and was granted a dismissal of its case against one of the defendants—Brown. This was done in open court in the presence and hearing of the jury. No motions were made at that time by any of the remaining defendants and the trial continued on as usual throughout the remainder of the day. The following morning, before testimony was resumed, but again in the presence of the jury, the government moved to dismiss defendant DeLa Rosa. At this time DeLucca's attorney requested a bench conference and moved for a mistrial, citing as grounds the unusual and irregular manner in which the government chose to dismiss Brown and DeLa Rosa. The other defense attorneys joined in this motion. Neither DeLucca's attorney nor any of the other defense attorneys requested that a curative charge be given, maintaining instead that the prejudicial effect caused by dismissing two of the five defendants caused irreparable harm. The experienced trial judge, who had heard all of the evidence up to that time, and was in a position to observe the jury and the overall posture of the case, saw no prejudicial effect on the jury as to the remaining defendants and promptly denied the motion for a mistrial without giving any instruction to the jury.

■ Defendants argue on appeal that their case was severely prejudiced by the government's actions and that, as a result, it should be reversed. Indeed, there is potential prejudice inherent in the motions to dismiss because of the implications cast upon the defendant's rights. While one person's guilt or innocence may not be used as substantive evidence for the guilt of another, and should not reflect in any way on the question of guilt, the potential nevertheless exists. *See e. g., United States v. Fleetwood*, 528 F.2d 528, 532 (5th Cir.1976); *United States v. King*, 505 F.2d 602, 607 (5th Cir.1974); *United States v. Baete*, 414 F.2d 782, 783 (5th Cir.1969). It is not at all uncommon for one or more of multiple defendants to enter guilty pleas during a trial or for the Government to move for dismissal of its case against one or more defendants, as was done here. In fact, the government has a duty to dismiss as to any defendant as soon as it finds that the evidence as to any of the defendants is insufficient to support a conviction. Of course, the dismissal of one or more defendants should not be used by the government in any way to directly or impliedly suggest to the jury that the remaining defendants are guilty. We do not find from the record that the government did anything other than to ask for a dismissal promptly upon making a determination that the evidence was not sufficient to justify a conviction. The court can discern no ulterior motive implicit in the government's motion.

It should be emphasized that because of the defense's trial tactics, they deliberately refused to ask the court for a cautionary jury instruction. The trial judge, in his discretion, could have done so, but declined. Therefore, on appeal, the defendants cannot argue on the one hand that a curative charge could not have ameliorated the situation and on the other that the trial judge should have issued a cautionary statement. Due to the inconsistency of the two arguments and to the defendants' failure to raise objection at the trial, we are permitted to find reversible error only if the substantive rights of the accused were blatantly and severely jeopardized. Fed.R.Crim.P.

52(b). Viewed in this context, we will review the questions in two stages: first, with respect to whether a trial judge is always required to issue a curative instruction once the jury learns that a codefendant has been dismissed, and, second, with respect to whether, in this particular case, the failure of the trial court to give one constituted plain error. Because the specific question is one of first impression in this circuit, we address it with caution and dispatch.

■ The problem of a defendant's guilt by association arises primarily when the jury learns of a codefendant's guilty plea entered either before or during the trial proceedings. A guilty plea entered by a codefendant can be especially prejudicial if the plea is made in connection with a conspiracy to which the remaining defendants are charged. *United States v. Medina–Arellano*, 569 F.2d 349, 356 (5th Cir.1978). This circuit has recommended that when a jury learns of a codefendant's guilty plea, the trial judge should immediately admonish them against transferring the guilt of one to another. See, *United States v. King*, 505 F.2d at 607; *United States v. Beasley*, 519 F.2d 233, 239 (5th Cir.1975). A cautionary instruction is generally sufficient to dispel any prejudice that arises from informing the jury of a codefendant's plea of guilty. *United States v. White*, 589 F.2d 1283, 1290, n.14 (5th Cir.1979). However, while a curative statement may be the preferred practice and is an important element in insuring the jury's impartiality, it is but one of the many factors to consider on review. The prevailing inquiry is one of fairness and to this end, jury instructions are important only insofar as they protect the substantive rights of the accused. *United States v. King*, 505 F.2d at 607.

It should be noted that this circuit has not considered the question of whether the prosecution's motion to dismiss is unfairly prejudicial to the remaining defendants. Another circuit has addressed this specific situation and concluded that, while the motion should have been made and ruled upon in the absence of the jury, the question of

prejudice was addressed to the sound discretion of the trial court. Its failure to grant the motion was not an abuse of discretion. *United States v. Barclift,* 514 F.2d 1073, 1074 (9th Cir.1975).

The cases canvassed in our circuit have involved guilty pleas made during the trial, which present similar, but not identical considerations. Indeed, it would appear that the risk of transferring the guilt is greater when the jury learns that a codefendant admits his guilt and changes his plea than when the prosecution admits that it lacks sufficient evidence to proceed against a codefendant. In the final analysis, however, it is the potential for prejudice and not the method of transmittal that determines the appropriate response. Accordingly, once the fact of a codefendant's guilt or innocence has been made known to the jury, it is incumbent upon the trial judge to take appropriate corrective action in order to protect the remaining defendants' substantive rights. Immediate jury instructions are but one of the many curative methods at his disposal.

Ordinarily, when the jury learns of a codefendant's guilt for the same or similar offenses, and the defense counsel does not request that a curative instruction be given, the failure of the trial judge to give one will not require reversal. *United States v. Beasley,* 519 F.2d at 240.[4] Only in those rare situations in which other "aggravating circumstances" have exacerbated the prejudice will the failure to give cautionary instructions result in plain and reversible error. *See e. g., United States v. Harrell,* 436 F.2d 606, 617 (5th Cir.1969) (court's conclusion of plain error was specifically predicated upon both aggravating circumstances and the absence of any cautionary instructions, as well as the lack of defense objections). With this in mind, we turn next to the specifics of the case in order to determine whether the trial judge's failure to charge the jury concerning the prosecu-

tion's motions to dismiss constitutes reversible error.

As we have pointed out, in assessing the need for a curative instruction once the jury learns of a codefendant's dismissal, the judge must consider many factors. Among them are the way in which the dismissal is brought to the jury's attention, the purpose and motivation for doing so, the emphasis placed on the codefendant's dismissal relative to the substantive aspects of the case, and the defense counsel's conduct with respect to the trial proceedings (i. e., whether his actions invited the announcement, whether he objected to it or demanded an instruction, or whether he refused to do so for tactical reasons). In the instant case, counsel for the defense did not request an instruction because they felt that the prejudice inherent in the prosecution's motions vitiated the effectiveness of any instruction. In fact, a corrective charge instructing the jury how to treat the dismissal may have overemphasized the incidents to the point of creating further prejudice. Therefore, the trial judge was not required to give one on his own initiative unless he felt that other circumstances made it necessary to do so. *United States v. King,* 505 F.2d at 607–608. He chose not to give a specific curative instruction, either immediately after the announcements or during his closing instructions to the jury. As a result, our review of the record must include an analysis of whether aggravating circumstances mandate reversal.

The trial judge made reference several times in his instructions to the jury to the presumed innocence of the individual defendants. He repeatedly urged them to consider the evidence separately as to each defendant, especially with respect to the conspiracy count. There was no intemperance shown on his part, and the record reveals that neither he nor the prosecutor did anything to adversely influence the jurors' minds. The combined factors of the

---

4. A review of this circuit's decisions on charges of plain error where the fact of a coconspirator's guilty plea was made known to the jury but unaccompanied by a cautionary instruction is found in *United States v. King,* 505 F.2d at 607, n.8, and *United States v. Fleetwood,* 528 F.2d at 532, n.6.

trial judge's dismissal of all substantive counts and the prosecution's admitted lack of proof against two defendants may not have prejudiced DeLucca at all; rather, it may have raised doubts of his guilt in the minds of some jurors. In fact, the defense counsel highlighted the problem by referring to the case in closing arguments as, "... the case of the disappearing defendants." Based on our review of the record, we can find no indication of any other circumstances which aggravated the potential prejudice created by the prosecution's motions to dismiss Brown and DeLa Rosa. Accordingly, while a curative charge would have inexorably avoided the potential prejudice, the failure to give one was not plain error.

### III. *The Sufficiency of the Evidence*

In the original indictment, appellant De-Lucca was charged with three criminal offenses; to wit, two substantive counts of possession with intent to distribute cocaine and one count of conspiracy to distribute cocaine. At the close of the government's case, the court *sua sponte* dismissed the two substantive counts against DeLucca, leaving only the conspiracy count. The jury subsequently found DeLucca guilty of the offense charged in the indictment. On appeal, appellant argues that his remaining count should also be dismissed because the evidence was insufficient to support the conviction.

In assessing the sufficiency of the evidence, we must view it in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Witt*, 618 F.2d 283, 284 (5th Cir.1980). All reasonable inferences which tend to support the government's case must be accepted and any conflicts in the evidence must be resolved in the government's favor. If the relevant evidence, viewed in the light most favorable to the government, could be accepted by a jury as sufficient to support a conclusion of the defendant's guilt beyond a reasonable doubt, then the conviction must stand. *United States v. Burns*, 597 F.2d 939, 941 (5th Cir.1979).

The essence of a conspiracy is the agreement to act in concert for an illegal purpose. *United States v. Ochoa*, 609 F.2d 198, 201 (5th Cir.1980). One does not become involved in a conspiracy simply by virtue of any knowledge of illegal activities and association with others who are themselves participants. In order to connect a defendant to a conspiracy, the prosecution must demonstrate that the defendant entered into an agreement with others knowingly and for the purpose of achieving an illegal objective. *United States v. Grassi*, 616 F.2d 1295, at 1301 (5th Cir.1980). Participation, however, need not be proven by direct evidence; a common purpose and plan may be inferred from a pattern of circumstantial evidence. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir. 1979) (en banc). In addition, evidence of the knowledge and association may be combined with other circumstantial evidence to prove the necessary agreement. *United States v. Grassi, supra* at 1301. Thus, the initial agreement to participate in an illegal venture, as well as the actual knowledge of the plan and the association in it may be inferred from the performance of acts that further its objectives and may be proved by circumstantial evidence. See, *United States v. Ochoa*, 609 F.2d at 201; *United States v. Prince*, 496 F.2d 1289, 1293 (5th Cir.1974); *United States v. Palacios*, 556 F.2d 1359, 1364 (5th Cir.1977).

Conspiracy is by definition an inchoate offense. In order to prove the crime, two distinct intentions must be demonstrated. The evidence must be sufficient to warrant belief beyond a reasonable doubt that:

(1) the accused intentionally entered into an agreement to do an illegal act, and

(2) the accused intended to consummate that act.

*United States v. Suarez*, 608 F.2d 584 (5th Cir.1979).

DeLucca concedes that he knew of the scheme to develop a Birmingham cocaine market, but insists that he took no part in

the discussions and never entered into the agreement. The record reveals that he was present during at least two conversations in which the cocaine deal was negotiated. Although the record does not establish the exact nature of his involvement in the conspiracy, he undoubtedly knew of its existence. As a result, his intentions to consummate the illegal acts can be inferred from his agreement to enter into the conspiracy. We must, therefore, review the record in order to determine whether he did, in fact, become a partner in crime. It is apparent from the record that DeLucca knew of the conspiracy's existence from its inception. He arranged the initial meeting between Pozo and Bagley, ostensibly for the purpose of setting up a tire deal. Bagley was in need of some quick money, and Pozo had in mind a more lucrative product—cocaine. While riding around in DeLucca's car, Pozo approached Bagley with the possibility of establishing a Birmingham "market." Although Bagley was not totally convinced of the idea, he agreed to meet with Pozo later in the afternoon, at which time they would exchange a cocaine sample. It was also agreed that "tires" would be used as a code word when discussing cocaine over the telephone. DeLucca insists that he took no part in the discussions, even though he was privy to all of the details.

Pozo's proposed meeting failed to materialize, but with DeLucca's assistance they were able to meet at his house that evening. DeLucca arranged the meeting over the phone and rendezvoused with Pozo and another man (later identified as Perez) at a convenience store, when Pozo could not find the house in the dark. Again, cocaine was the topic of conversation, and again, DeLucca insists that he took no part in the negotiations.

 From these facts, we concluded that DeLucca, an experienced attorney, was a willing and informed member of the conspiracy. He got the co-conspirators together, met with them, and heard their conversations in which drugs and the feasibility of getting a large amount of cocaine delivered to Birmingham were discussed. In short, he helped put the conspiracy together. If he did not intend to take part in the conspiracy, he had a duty, as an attorney, to report the matter to the proper parties and tell the members of the conspiracy that he wanted to withdraw and have nothing to do with their plan to purchase and distribute cocaine. He could not, by remaining silent, disclaim any knowledge or responsibility for the conspiracy that was formed in his presence and hearing and with his assistance. DeLucca, as an attorney, had a high duty to take some affirmative action to defeat or disavow the purpose of the conspiracy before an overt act was committed in furtherance of the conspiracy. *United States v. Jimenez*, 622 F.2d 753, 755 (5th Cir.1980). While we do not by this decision create a standard whereby an attorney can be convicted of a conspiracy which is lower than the standard for others, it is appropriate to consider the canons of professional responsibility as a factor in determining DeLucca's willing participation in crime.[5]

DeLucca did not, at any time before or during the conspiracy, take any action to disassociate himself from it. On the contrary, he made the conspiracy possible by his indirect, yet significant participation. DeLucca offers several explanations for his actions, claiming that he acted only on the periphery. We have considered every reasonable hypothesis of his innocence, see *United States v. Black*, 497 F.2d 1039, 1041 (5th Cir.1974), and find them to be unsupported by the evidence. Accordingly, viewing the evidence in the light most favorable to the government, and accepting all reasonable inferences that support the jury verdict, we find that DeLucca did, in fact, agree to enter into the conspiracy. Furthermore, he did so knowingly and with the intention of consummating an illegal act. The evidence is sufficient to support the jury's verdict.

---

**5.** See ABA Code of Professional Responsibility: DR1-102(A)(5); EC1-1; EC7-5; DR7-102(A)(7) and (8).

### IV. *Conclusion*

Appellants raise numerous other questions for our consideration. We have reviewed the record and find their other contentions to be without merit.

AFFIRMED.