STATE OF NORTH CAROLINA v. PAUL OVERTON, JR., JAMES WARREN
SMEDLEY, LUCHAI RUVIWAT, AND ATHA ATKINSON

No. 818SC1244

(Filed 21 December 1982)

1. **Criminal Law § 92.2— consolidation of charges against multiple defendants — conspiracy over extended period of time — common scheme or plan**

Offenses charged against sixteen defendants for conspiracy to manufacture, to possess with intent to sell and deliver, and to sell and deliver heroin and for the manufacture, possession with intent to sell and deliver and sale or delivery of heroin were all part of a common scheme or plan within the meaning of G.S. 15A-926(b)b.1. and could properly be joined for trial where all the defendants were allegedly participants in a large-scale conspiracy to smuggle heroin from Thailand for marketing in North Carolina which continued for some years, notwithstanding participants entered and exited the conspiracy at various times between the years 1969-78.

2. **Criminal Law § 92.5— numerous defendants — mass of evidence relating to other defendants — severance not required**

Severance of the trials of numerous defendants charged with conspiracy to commit narcotics offenses and with narcotics offenses was not necessary to provide each defendant with a fair trial because of the mass of evidence presented relating to the activities of the other defendants since such evidence was relevant to show the existence of the ongoing conspiracy charged in the indictments, evidence relevant only to particular defendants was clearly limited to those defendants by the trial court, and the court instructed that the jury was to consider the evidence against each defendant separately. G.S. 15A-927(b).

3. **Criminal Law §§ 9.1, 10— defendant not at crime scene — no conviction as principal on conspiracy theory**

In a prosecution of multiple defendants on various charges of possession, manufacturing, and sale and delivery of heroin, the trial court committed prej-

1

udicial error in giving the jury instructions which permitted the jurors to find a defendant guilty as a principal to a crime at which he was not actually or constructively present because he participated in a conspiracy to commit the crime.

**4. Criminal Law § 113— application of evidence to law of circumstantial evidence and conspiracy**

The trial court sufficiently applied the law of circumstantial evidence and the law of conspiracy to the evidence in the case. G.S. 15A-1232.

**5. Witnesses § 1.1— mental competency of witness to testify**

The trial court did not err in concluding that a witness who was under the care of a psychiatrist was competent to testify where the court found upon supporting evidence that the witness suffered from an emotional disorder, that she had difficulty recalling certain events, especially dates, that she understood the nature of the oath, and that she had the ability to recall past events and occurrences.

**6. Narcotics § 2— conspiracy beginning prior to Controlled Substances Act·-reference in indictment to the Act**

An indictment alleging a conspiracy beginning in 1969 and continuing until 1978 to possess, sell and deliver and manufacture heroin "in violation of the Controlled Substances Act" did not fail to state a criminal offense because the Controlled Substances Act was not effective until 1 January 1972 since (1) the Uniform Drug Act, G.S. 9-86 *et seq.*, remained in full force and effect as to offenses committed prior to 1 January 1972, (2) the conspiracy alleged was a crime under both statutes, and (3) reference in the indictment to the specific statute allegedly violated was immaterial.

**7. Narcotics § 2— allegations of conspiracy between certain dates—evidence of defendant's late entry into conspiracy—no fatal variance**

There was no fatal variance between an indictment alleging a conspiracy to possess, sell, deliver, and manufacture heroin from sometime in 1969 until 28 March 1978 and evidence showing that defendant took an active part in the conspiracy in 1974 and at various times thereafter, since defendant's relatively late entry into the conspiracy did not preclude her conviction as a participant in the conspiracy, and the single conspiracy did not become several merely because of personnel changes.

**8. Narcotics § 1.3— conspiracy to possess heroin—lesser included offense of conspiracy to possess with intent to sell and deliver**

Conspiracy to possess heroin is a lesser included offense of conspiracy to possess heroin with intent to sell or deliver.

**9. Narcotics § 4— conspiracy to possess, possess with intent to sell and sell heroin—sufficiency of evidence**

In a prosecution for conspiracy between 1969 and 1978 to manufacture, possess with intent to sell and deliver and sell and deliver heroin shipped from Thailand to North Carolina, the State's evidence was sufficient for the jury on issues of guilt of each of three defendants where it tended to show: (1) one

defendant stored heroin in his home as early as 1975, was initially paid $1,000.00 per month for such storage, and in 1976-77 stashed large amounts of heroin in his home which would be retrieved by a co-conspirator for delivery; (2) a second defendant participated in shipping heroin in AWOL bags and in furniture from Thailand to North Carolina; (3) and the third defendant met with a co-conspirator in 1974 and accepted two AWOL bags of heroin for which she gave him $6,000.00, met periodically in 1975 with another co-conspirator who supplied her with bags of heroin for which she paid $1,000.00 apiece, and knew enough about the overall operation to suspect in 1976 that other co-conspirators were "ripping off" her husband, who headed the heroin operation but was then in prison.

**10. Criminal Law § 91— statutory speedy trial—exclusion of time pending motion for change of venue**

The time between the filing of a motion for a change of venue on 30 May 1979 and its disposition on 19 December 1979 was properly excluded pursuant to G.S. 15A-701(b)(1)(d) in computing the statutory speedy trial period, the motion having been heard within a reasonable time after it was filed in view of the complexity of the case, which involved multiple defendants, and the numerous pretrial motions made by defendant and his codefendants.

**11. Searches and Seizures § 15— disclosure of bank, employment and telephone records—no standing to object**

Defendants had no standing to challenge on Fourth Amendment grounds the disclosure to the State of defendant's bank accounts, credit union account, employment records and telephone records.

**12. Arrest and Bail § 9— one million dollar bail not unreasonable**

Bail of $1 million for a defendant charged with various offenses relating to the shipment of heroin from Thailand for distribution in North Carolina was not unreasonable because defendant was found to be indigent and entitled to appointed counsel, because defendant was subject to federal incarceration at the time and the State would have been able to find him at the time of trial, or because defendant's incarceration in a State prison rather than a federal prison deprived him of access to federal prison law libraries for the preparation of his defense and better communication and exercise facilities of a federal prison. N.C. Const., Art. 1, § 27; G.S. 15A-533; G.S. 15A-534(c).

**13. Criminal Law § 128.2— denial of mistrial**

In a prosecution of multiple defendants for offenses related to drug smuggling, one defendant was not prejudiced by refusal of the trial court to order a mistrial after an officer testified concerning numerous taped conversations among drug smuggling conspirators and the trial court then refused to admit the tapes into evidence where the officer's testimony did not directly relate to such defendant.

**14. Conspiracy § 5; Narcotics § 3.1— testimony about "dope" and "heroin"—showing state of mind**

In a prosecution for conspiracy to possess, manufacture and sell or deliver heroin smuggled into North Carolina from Thailand, the trial court did not err

State v. Overton

in permitting witnesses for the State to testify about "dope" and "heroin" without the State first laying a foundation supporting the witnesses' identification of the substance since (1) defendant lost the benefit of his objection to such testimony when the same evidence was later admitted without objection, and (2) the testimony was competent to show the state of mind of the witnesses in believing that the substance being transported in certain AWOL bags and furniture was heroin and thus was relevant to show the conspiracy alleged.

15. **Conspiracy § 8; Narcotics § 5— verdict not invalid because of disjunctive**

Defendant was not prejudiced by a verdict finding him guilty of conspiracy to manufacture, possess with intent to sell and deliver *or* sell and deliver heroin because of the presence of the disjunctive since it is clear that the jury found defendant guilty of conspiracy, the parameters of the conspiracy could include either a conspiracy to manufacture or to possess with intent to sell and deliver or to sell and deliver heroin, the punishments for conspiracy to do any one of these three offenses are the same, and the trial court's judgment contained a sentence well within the statutory limits. G.S. 90-95.

16. **Criminal Law § 26.5— conspiracy conviction in federal court—conspiracy trial in State court—same act not involved—no double jeopardy**

The double jeopardy statute of the Controlled Substances Act, G.S. 90-97, was not violated by the State's prosecution of defendant for conspiracy to manufacture, to possess with intent to sell or deliver, or to sell or deliver heroin after defendant had pled guilty in a federal court to conspiracy to import heroin in violation of 21 U.S.C. § 963, since "the same act" was not involved in both prosecutions within the meaning of G.S. 90-97.

17. **Witnesses § 10— denial of motion to depose prisoner in another state—statutory remedy to obtain testimony**

The trial court did not err in the denial of defendant's motion to depose a co-conspirator who was confined in a New Jersey prison at the time of trial since defendant had an appropriate remedy under G.S. 15A-822 to secure the attendance of a prisoner outside the state as a witness in his trial.

18. **Criminal Law § 14— conspiracy entered in foreign country—jurisdiction over conspiracy prosecution**

The North Carolina courts had jurisdiction to try defendant for conspiracy to manufacture, possess with intent to sell and deliver, and sell and deliver heroin, notwithstanding defendant was acquitted of the substantive offenses involving heroin which occurred in North Carolina and the State's evidence tended to show that he entered the conspiracy while living in Thailand, since our courts have jurisdiction over those involved in a criminal conspiracy if any one of the conspirators commits an overt act in furtherance of the conspiracy within the state, even if the unlawful conspiracy was entered outside the state.

19. **Constitutional Law § 31— denial of interpreter for foreign defendant**

An order providing for the appointment of an interpreter at State expense for a defendant who was a Thai national was an interlocutory order

State v. Overton

which could be altered upon a showing of changed circumstances, and the trial court did not err in revoking such order where the court found upon supporting evidence that defendant had eight years of education related to reading and writing English and that he had sufficient understanding of the language to enable him to confer with his attorney and assist in his own defense.

**20. Criminal Law § 83— co-conspirator spouses—admissibility of spouse's statements against other spouse**

Evidence of statements made by one spouse implicating the other spouse is admissible against the other where the spouses were co-conspirators. G.S. 8-57.

**21. Conspiracy § 5— involuntary commitments of defendant—irrelevancy**

In a prosecution for conspiracy to manufacture, possess with intent to sell and deliver, and sell and deliver heroin, evidence of one defendant's involuntary commitments during three time periods which did not include the times the evidence showed defendant's involvement in the conspiracy was irrelevant and properly excluded.

**22. Conspiracy § 7— possession of proceeds of husband's crimes—refusal to instruct on insufficiency to establish agreement to commit crime**

In a prosecution for conspiracy to manufacture, possess with intent to sell and deliver, and sell and deliver heroin, the trial court did not err in refusing to instruct the jury that defendant's mere subsequent possession of the proceeds of her husband's crimes was not sufficient to establish an agreement between them to commit the crimes where there was clear evidence showing that defendant was a participant in the conspiracy in that she picked up drugs, purchased heroin from a co-conspirator, and had knowledge of problems with money within the conspiracy.

APPEAL by defendants from *Smith, Judge.* Judgments entered 4 August 1980, in Superior Court, WAYNE County. Heard in the Court of Appeals 31 August 1982.

*Attorney General Rufus L. Edmisten, by Assistant Attorneys General Joan H. Byers and Francis W. Crawley, for the State.*

*Dees, Dees, Smith, Powell & Jarrett, by Tommy W. Jarrett, for defendant-appellant Overton.*

*C. Branson Vickory for defendant-appellant Smedley.*

*Malone, Brown and Matthewson, P.A., by Glennie M. Matthewson, II, for defendant-appellant Ruviwat.*

*Hulse & Hulse, by Herbert B. Hulse, for defendant-appellant Atkinson.*

WELLS, Judge.

The defendants were indicted on charges of conspiring with numerous individuals to manufacture, to possess with intent to sell and deliver, and to sell and deliver heroin and on various charges of manufacture, possession with intent to sell or deliver, and sale or delivery of heroin. Thirteen other individuals[1] were also indicted on related charges, and the State's motion to consolidate all seventeen cases was allowed. All four defendants who have appealed were found guilty of some degree of conspiracy and all of them, except defendant Smedley, were found guilty of one or more substantive violations of the North Carolina Controlled Substances Act, G.S. 90-86, *et seq.* The issues on appeal include questions concerning the trial court's consolidation of the cases, instructions to the jury, rulings on evidentiary matters as well as on numerous motions, and sufficiency of the evidence. Because of the trial court's erroneous instructions on vicarious liability related to the substantive offenses, we reverse defendant Atkinson's conviction of the substantive counts and we order a new trial for defendants Overton and Ruviwat on the substantive counts. There was no error in the trial affecting defendant Smedley.

EVIDENCE AT TRIAL

The State's evidence at trial tended to show the historical development of a complex and lucrative scheme of drug smuggling which began in the mid-1960's.[2] The following summary sketches representative activities of the conspiracy which the State's evidence tended to show and focuses on the particular in-

1. From the record, it is difficult to ascertain exactly how many defendants were originally charged with participating in related drug transactions. Although defendants' briefs indicate there were sixteen co-defendants, seventeen were named in the State's last motion to consolidate. Some of the defendants thereafter entered guilty pleas; the charges against others were dismissed. The cases of eight defendants were submitted to the jury, and four of those defendants were acquitted.

2. Testifying at trial were many of the participants in the smuggling; most of these individuals had entered guilty pleas with the State, had already been prosecuted for their drug activities, and/or had been granted immunity. Among these people were Herman Jackson, Robert Patterson, Freddie Clay Thornton, William K. Wright, Herbert Houston, Laura Holmes Smith, Vernon Lucas, Harry Terrell, William G. Hill, and Wilbur Fuller.

volvements of the four defendants who have appealed their convictions.

In the mid-1960's, in Bangkok, Thailand, three retired military personnel, Herman Jackson, Leslie "Ike" Atkinson (husband of defendant Atha Atkinson and hereinafter referred to as Ike Atkinson) and James Smedley, and a Thai national named Luchai Ruviwat became acquainted. In May 1967, Jackson, Smedley, Ruviwat, and another friend went into business together, owning and operating Jack's American Star Bar, a Bangkok hangout for American military personnel. In 1968, Ike Atkinson and Jackson began smuggling heroin from Thailand to the United States. Jackson was primarily responsible for shipments from Thailand. In this country, Ike Atkinson would receive and distribute the heroin and also collect and distribute the proceeds of sales. Jackson estimated that, from 1968 until January 1972, he was involved in ten or eleven heroin shipments which went to such places as a National Guard Armory in Philadelphia, Walter Reed Medical Facility in Washington, D.C., and Monmouth, New Jersey.

Various servicemen were involved in the venture. In 1969, Robert Patterson, using his position as postal clerk, mailed packages of heroin to New Jersey. Later James McArthur, an administrative postal clerk, replaced Patterson in the mailing of heroin. Both Ike Atkinson and Jackson actively recruited military personnel for the venture. On at least one occasion in mid-1970, Jackson received four or five kilos from Ruviwat, which he directed to Freddie Clay Thornton, a member of the United States Air Force. In early 1971, Thornton, while returning from Thailand, concealed in the nose of a military aircraft an AWOL bag containing five kilos of heroin, and in July 1971, he returned from Thailand to Travis Air Force Base in California with two boxes of heroin.

According to Thornton's testimony, there was no drug traffic "from after 1971 until sometimes in 1974." In 1972, however, Jackson was arrested when twenty pounds of heroin were seized in Colorado. He was convicted and imprisoned in Leavenworth, Kansas, and, at the time of this trial, remained a federal prisoner.

There was other evidence tending to show that sometime in 1973, Ike Atkinson initiated drug shipments to the U.S. by con-

cealing heroin inside furniture. Patterson conceived the idea of placing false bottoms on furniture and suggested it to Ike Atkinson by letter. Ike Atkinson hired a carpenter from this country to go to Thailand to put a "professional finishing touch" to the furniture. Meanwhile, the more conventional methods for smuggling continued. In June 1974, defendant Smedley approached Patterson and paid him $6,000 to carry AWOL bags containing heroin to the U.S. On 20 June 1974, Patterson delivered the bags to defendant Atha Atkinson who, with her daughter, met Patterson at the Holiday Inn in Goldsboro. Atha Atkinson paid Patterson $6,000. Also in the time period 1973-74, Vernon Lucas, who lived in New Jersey, began to work for Ike Atkinson. He mailed boxes containing as much as $70,000 to Bangkok; he personally delivered thousands of dollars to Thailand; through the mail he received heroin which he turned over to his brother Frank Lucas for distribution in New York; and he flew at least twice to the Cayman Islands to put money in a bank.

In February 1974, Thornton was sent back for another military tour in Thailand. In the summer of that year, defendant Smedley asked Thornton to get leave and return to the U.S. Thornton arranged a thirty day leave to attend school, picked up AWOL bags from Smedley, and checked them on his flight back to the U.S. Thornton delivered the bags to Goldsboro and, while there, arranged for a friend to accept and handle future shipments of heroin he was to make through military flight crew chiefs.

Meanwhile, in Bangkok, in October 1974, Smedley continued his activities by delivering to William Wright a package containing $10,000 which was eventually picked up from Wright by Herbert Houston. Houston, a sergeant in the Air Force, worked with James McArthur in the air post office in downtown Bangkok and had begun mailing packages of heroin for McArthur shortly after August 1974.

After returning to Thailand from his education leave, Thornton went to SOI 53 where he observed the packing of heroin into furniture being shipped to the U.S. by Ike Atkinson. Among those present was William Wright. The shipment being prepared was known as the "Brown Shipment," a soldier by the name of Brown having agreed to ship the heroin to Augusta, Ga. with his

household goods. For the Brown shipment, fifty kilos of heroin were purchased from defendant Ruviwat. Later a "Myrick" shipment of 52 kilos was arranged by Thornton, who, with Jackson in prison, had become Ike Atkinson's major representative in the transactions being initiated in Thailand.

The illicit drug activities proliferated in the period beginning in 1974. Apparently, at about the same time the Brown shipment was being prepared, Smedley himself was arranging a shipment concealed in furniture. Also during this period, Thornton had activated his plan to ship heroin by military flight crew chiefs; for this purpose, he purchased heroin from Smedley for shipments in November and December 1974.

Although there was ample evidence that, throughout the conspiracy period, shipments of heroin were successfully being delivered to places within the United States, the evidence concerning drug activities in North Carolina focused on the mid- to late- 1970's. Sometime in the early part of 1975, Laura Holmes Smith started working with Ike Atkinson, allowing him, Ronnie, Buster, and Dallas Atkinson to use her home in Goldsboro to package and store heroin. In June 1975, Ike Atkinson, having been convicted on federal drug charges, entered the Atlanta Federal Penitentiary. Before he left, he asked Smith to keep the heroin, but to allow Atha Atkinson to purchase relatively small bags of the drug. In fact Atha Atkinson did purchase about four or five bags, each containing about one ounce of heroin.

In prison, Ike Atkinson was reunited with Herman Jackson who had been transferred from Leavenworth. With help from associates, they were able to keep the drug smuggling business alive. In August 1975, Sharon Atkinson Arrington, daughter of Ike and Atha Atkinson, delivered several messages from her imprisoned father to Freddie Thornton. One message put Thornton in charge of the entire operation in Thailand. However, shortly afterwards, in September, Thornton was arrested by Drug Enforcement Administration agents and was returned to the U.S. where he feigned cooperation and was eventually released. In October, Thornton retrieved the Brown Shipment in Augusta, Georgia and delivered it to Michael and Sharon Arrington at Seymour Johnson Air Force Base in Goldsboro.

The chief messenger for Ike Atkinson and Jackson during their incarceration was Laura Smith. In 1976, Ike Atkinson was returned to North Carolina, placed in the Wake County jail and tried again. Herman Jackson also was moved to the jail. After seeing both Ike Atkinson and Jackson, and following their directions, Smith received some heroin from Dallas Atkinson, repackaged it, and delivered it to Harry Terrell at the Howard Johnson Motor Inn in Smithfield. Thereafter Smith had five or six meetings with Terrell in various places in North Carolina and Maryland. Smith estimated that she received from Terrell approximately one million dollars for heroin delivered to him.

During the summer of 1976, Atha Atkinson told George Wynn, a Goldsboro native also involved in the Ike Atkinson organization, that somewhere in Johnston County, Dallas and Buster Jack Atkinson and Pearl and Ed Atkinson had "something" belonging to her husband. She apparently believed that these four and others were involved in a "rip-off" of her husband; she linked Laura Smith to this suspicion because Smith refused to turn over money due Atkinson's husband.

Smith delivered messages for Herman Jackson to defendant Overton; the messages were written by Ike Atkinson. After delivering the second message, Smith picked up from Overton a trunk of heroin which she took to Charlotte Best's house, where, with the help of Ennis Allen, she weighed and sealed approximately seventy-three one-kilo bags of heroin. The bags were returned to Overton who agreed to store them. During 1976 and 1977, at Jackson's direction, Smith met with Overton approximately five times to transfer heroin. For his participation, Overton initially received $1,000 per month; later this was reduced to $500 per month. After receiving the bags of heroin from Overton, Smith would pass them on to Harry Terrell.

Overton was also involved in passing money to Smith. On two or three occasions in the 1976-1977 period, Smith met Overton in the gym of the Goldsboro Middle School South and received from him a bag of money. These transactions were also at the direction of Herman Jackson, who remained at Atlanta Federal Penitentiary. Smith's last transaction with Overton occurred sometime in early 1977, when she received heroin from Overton and delivered it to James Melvin Harper, Holmes' cousin

who was employed to work for Ike Atkinson. Harper then unwittingly turned the heroin over to an undercover S.B.I. agent, Martha Owens, on 23 May 1977. This was the last drug transaction for which the State presented evidence. The State did, however, introduce records of defendant Overton's bank accounts showing numerous substantial cash deposits during the period of his alleged involvement in the conspiracy.

Defendant Overton's evidence tended to show that he was a teacher and that his schedule in the Goldsboro Middle School gym coincided with those of two other teachers who had never seen Laura Smith in the gym. Overton did carpentry work and thereby earned money to supplement the salary he received for teaching.

Defendant Smedley offered into evidence a stipulation with the State showing his incarceration in Thailand from 20 October 1975 until January 1978.

Defendant Ruviwat offered into evidence indictments against witnesses Patterson and Jackson, a judgment against witness Thornton, and a stipulation that Ruviwat's brother, if called to testify, would say that his brother has a good reputation in the Thai community in which he lives.

Defendant Atkinson offered into evidence copies of bills of indictment against Jackson and Wilbur Fuller, both witnesses for the State.

The jury found Overton guilty of one count of conspiracy to possess heroin, one count of possession of heroin, two counts of manufacture of heroin, and one count of sale or delivery of heroin. The trial court consolidated judgment for the conspiracy to possess and the actual possession, and sentenced Overton to not less than nor more than five years imprisonment. The two counts of manufacture were consolidated with the sale and delivery of heroin. Overton received a maximum of ten and a minimum of ten years imprisonment, the two terms to run concurrently.

The jury found defendant Smedley guilty of conspiracy to manufacture, to possess with intent to sell or deliver, or to sell and deliver heroin, but acquitted him of the substantive charges. Smedley received a prison term of six years to run concurrently with an eight year prison term imposed on 15 May 1979, in U.S. District Court, Eastern District of North Carolina.

The jury found Ruviwat guilty of conspiracy to manufacture, to possess with intent to sell or deliver, or to sell and deliver heroin, of possession with intent to sell or deliver heroin, and of sale or delivery of heroin. On the conspiracy charge, Ruviwat was sentenced to five years, to run concurrently with a thirty year sentence imposed on 15 January 1976, in U.S. District Court, Northern District of California. For the substantive offenses, he was sentenced to ten years to run concurrently with the five year term and the thirty year federal sentence.

The jury found Atha Atkinson guilty of one count of conspiracy to possess heroin, one count of possession of heroin, two counts of manufacture of heroin, and one count of sale or delivery of heroin. The trial judge consolidated the conspiracy and possession counts and sentenced Atha Atkinson to a maximum and minimum term of five years in prison and a fine of $5,000. On the manufacture and sale or delivery counts, Atkinson was sentenced to a maximum term of ten years and a minimum term of one year plus a $10,000 fine.

Additional facts as necessary will be set out in the discussion of the issues to which those facts pertain.

Common Issues On Appeal

I

[1] In their briefs, all four defendants present two common questions concerning the trial of their cases. The first question is whether the trial court erred in consolidating the sixteen cases and in failing to allow the defendants' repeated motions for severance.

G.S. 15A-926(b)(2) sets forth the grounds for a motion by the State for joining the cases of multiple defendants:

a. When each of the defendants is charged with accountability for each offense; or

b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

Defendants argue, and the State concedes, that the basis for consolidation in the present case is G.S. 15A-926(b)(2)b.1., all of the offenses charged allegedly being part of a common scheme or plan. Defendants contend, however, that, since their indictments alleged different years of participation in the conspiracy, the four defendants could not have been involved in a common scheme or plan. We disagree. The indictments alleged, and the evidence at trial tended to show, that the four defendants were participants in an on-going, large-scale conspiracy to smuggle heroin from Thailand for marketing in North Carolina. The fact that participants entered and exited the conspiracy at various times between the years 1969-1978 did not convert one conspiracy into several. *United States v. Bates*, 600 F. 2d 505 (5th Cir. 1979). The conspiracy was originally based on a common scheme, and its continuation over several years did not sever that common scheme.

Several defendants argue that *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), supports their argument that multiple conspiracies were involved and that a consolidated trial was prejudicial to them. *Kotteakos* involved a number of defendants charged with conspiring to induce various financial institutions to grant credit, with the intent that the loans be offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information. A central figure in the applications was one Brown. The Court found several separate conspiracies because each agreement with Brown was completely separate; those involved with one application had no connection with those dealing with another application. The Supreme Court accepted the government's analogy that the pattern was "that of separate spokes meeting at a common center," but it disagreed with the government when it concluded that trial upon indictments alleging one conspiracy, with instructions to the jury which underlined the single conspiracy, was prejudicial.

The factual situation in *Kotteakos* is distinguishable from the situation in the case at bar, where numerous individuals represented different links in a common scheme or plan of

distribution. The present case is more closely attuned to *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), where the Court found one conspiracy even though each individual defendant acted separately. Since all the defendants knew of and joined the overall scheme of selling whiskey at over-ceiling prices, there was one conspiracy:

> The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.

332 U.S. at 558, 68 S.Ct. at 257, 92 L.Ed. at 168-69. *See also United States v. Perez*, 489 F. 2d 51 (5th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067-68, 41 L.Ed. 2d 664 (1974) (conspiracy among numerous individuals, including doctors and lawyers, to stage automobile accidents and to file and collect for fraudulent insurance claims); *and State v. Smith*, 237 N.C. 1, 74 S.E. 2d 291 (1953) (to be guilty of conspiracy, a defendant does not need to be acquainted with the others engaged in the conspiracy).

[2] Having concluded that the offenses charged against these defendants were parts of a common scheme or plan and, therefore, subject to being joined for trial, we now address the question of whether severance of the trials was necessary in order to provide defendants with fair trials. Under G.S. 15A-927(b), severance of offenses is necessary whenever:

> (1) If before trial, it is found necessary to promote a fair determination of the defendant's guilt or innocence of each offense; or
>
> (2) If during trial, upon motion of the defendant or motion of the prosecutor with the consent of the defendant, it is found necessary to achieve a fair determination of the defendant's guilt or innocence of

> each offense. The court must consider whether, in
> view of the number of offenses charged and the com-
> plexity of the evidence to be offered, the trier of fact
> will be able to distinguish the evidence and apply the
> law intelligently as to each offense.

In addition to objecting to orders of consolidation, each defendant made numerous motions throughout the trial to sever his trial from the trial of the other defendants. Each now contends that failure to sever subjected him to many days of trial involving numerous witnesses who never mentioned him, indeed may not even have known him, and that the mass of evidence being largely irrelevant to the question of his guilt was highly prejudicial to him.

Our Supreme Court has held that the trial court's exercise of authority to consolidate cases for trial is discretionary and will not be disturbed on appeal absent a showing that a joint trial deprived a defendant of a fair trial. *State v. Slade*, 291 N.C. 275, 229 S.E. 2d 921 (1976). The allegedly irrelevant testimony in this trial tending to show the criminal activities of various participants in the conspiracy was relevant to show the existence of the on-going conspiracy charged in the indictments. *United States v. Bates, supra.* We are not unmindful of the necessary precautions which must be taken to assure that each defendant is not unfairly tainted by such evidence. In *Blumenthal, supra*, the United States Supreme Court set forth safeguards for the admission of evidence at trial involving multiple defendants: clear rulings on admissibility, limitations on the relevance of evidence vis-à-vis a particular defendant, and adequate instructions. *See also Kotteakos v. United States, supra.* In reviewing the record of this trial, we find that the trial court employed these safeguards to avoid the chance that the jury would be confused over the import of the evidence. Further, in the instructions to the jurors, the Court admonished them that, although the cases were consolidated for trial, they were to consider the evidence against each defendant separately. Of the eight defendants whose cases were submitted to it, the jury acquitted four, indicating its ability to distinguish and weigh the evidence independently as to each defendant. After reviewing this and other related assignments of error, we are unable to say that denial of the defendants' motions to sever deprived any of them of a fair trial. *See also United*

*States v. Moten*, 564 F. 2d 620 (2nd Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed. 2d 318 (1977). These assignments are overruled.

## II

[3]  The next issue common to each defendant's appeal involves the trial court's instructions on the theory of vicarious liability. The law of vicarious liability — under which a conspirator may be guilty as a principal to crimes actually committed by a co-conspirator — has been set out by our Supreme Court in *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980).

In *Small*, the defendant hired two men to kill his estranged wife. The two men succeeded. Small was indicted on charges of conspiracy to commit murder and first degree murder. At trial, the court gave this final mandate to the jury:

> "So, I charge that if you should find from the evidence, beyond a reasonable doubt, that on the 14th day of November, 1978, either Paul Lowery or Vincent Johnson intentionally strangled or smothered Evelyn Small, thereby proximately causing Evelyn Small's death, to kill her, and that the act was done with malice, with premeditation and deliberation, *and that the person who strangled or smothered Evelyn Small had previously agreed with James Small to murder Evelyn Small, and at the time of the agreement, James Small and the person with whom he made the agreement intended that it be carried out, and that the agreement had not been terminated, and that the strangling or smothering was done in the furtherance of the agreement, then it would be your duty to return a verdict of first degree murder, as alleged in the Bill of Indictment, as to James L. Small.*" (Emphasis supplied in original.)

*Id.* at 411, 272 S.E. 2d at 131. The jury found Small guilty of conspiracy to commit murder and first degree murder. On appeal, the Court found error in these instructions and remanded for entry of a verdict of guilty of accessory before the fact to murder.

While the Court's discussion of the issue was lengthy and involved extensive analysis of previous North Carolina cases, we find it necessary only to set forth the Court's summary of its holding:

State v. Overton

     (1) Evidence sufficient to show defendant's involvement in a criminal conspiracy does not itself establish defendant's liability as a party to the substantive felony committed as a result of the conspiracy; it is reversible error for the court to so instruct the jury.

     (2) Such evidence will nevertheless always be *relevant* to submit to the jury as proof of defendant's complicity in the substantive felony charged, in that it tends to show either (a) defendant, though absent at the felony's commission, nevertheless counseled, procured, or commanded its commission, or (b) that defendant, present at the scene of the felony, shared in the criminal intent of the actual perpetrators and thus aided and abetted in the felony's occurrence or acted in concert with those who committed it. What the evidence does in fact show, however, is for the jury to decide.

     (3) Unless and until the legislature acts to abolish the distinction between principal and accessory, a party to a crime who was not actually or constructively present at its commission may at most be prosecuted, convicted and punished as an accessory before the fact.[3]

*Id.* at 428-29, 272 S.E. 2d at 141.

In the present case, defendants argue that in its instructions, the trial court erred under *Small.* The court charged the jury generally on the theory of vicarious liability as follows:

     In order for you to find a particular defendant guilty of any count in the bill of indictment based on the theory of vicarious liability, the State would be required to prove three things beyond a reasonable doubt.

---

    3. In 1981, the General Assembly enacted G.S. 14-5.2 which reads in pertinent part:

    All distinctions between accessories before the fact and principals to the commission of a felony are abolished. Every person who heretofore would have been guilty as an accessory before the fact to any felony shall be guilty and punishable as a principal to that felony.

This statute became effective 1 July 1981, and was made applicable to all offenses committed on and after that date. It does not, therefore, apply to the cases of defendants.

First, that the defendant whom the State seeks to convict by reason of the theory had entered into a conspiracy to commit the crime which was charged.

Second, that a co-conspirator or co-conspirators had in furtherance of the conspiracy actually committed the crime which was charged under the theory of vicarious liability.

And third, that the commission of that crime was committed, or the crime was committed, while the conspiracy was in existence and before it ended.

The State concedes, and we agree, that under the principles set forth in *Small*, the trial court in the present case erred because these instructions allowed the jurors to find a defendant guilty as a principal to the commission of a crime at which he was not actually or constructively present. Before we analyze the erroneous instructions as they pertain to each defendant on substantive offenses, it is pertinent to review the law concerning accessories before the fact. In *State v. Hunter*, 290 N.C. 556, 227 S.E. 2d 535 (1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed. 2d 539 (1977), our Supreme Court held that conviction of a defendant for being an accessory before the fact required the State to prove "(1) that the defendant counseled, procured, commanded, encouraged, or aided another to commit the offense; (2) the defendant was not present when the crime was committed; and (3) the principal committed the crime." 290 N.C. at 576, 227 S.E. 2d at 547. Under the reasoning of *Small*, it was not necessary that defendants in this case be indicted as accessories before the fact to the offenses charged. At the time the indictments against defendants were returned (21 May 1979, for defendants Overton, Smedley, and Ruviwat, and 30 July 1979, for defendant Atkinson), the law in this State allowed one indicted for the principal felony to be convicted upon that indictment as an accessory before the fact. *See* G.S. 14-5.[4]

---

4. G.S. 14-5.1, which became effective 1 October 1979, provides that any person "who shall be charged with the principal felony in an indictment . . . may not be convicted as accessory before the fact to the principal felony on the same indictment. . . ." In *State v. Small, supra*, the Supreme Court interpreted this statute to apply only to those cases in which an indictment is returned on or after 1 October 1979.

State v. Overton

Application of these principles to defendant Overton persuades us that the trial court erroneously instructed the jury that Overton's guilt as a principal in the substantive offenses could be found if any one of his co-conspirators were guilty as a principal. Overton was charged with, and found guilty of possession of heroin (on or about 19 September 1976), two counts of manufacturing heroin (between 3 September 1976 and 19 September 1976, and in late September or early October 1976) and sale and delivery of heroin (to Agent Owens, on or about 23 May 1977). The State's evidence does not establish Overton's actual or constructive presence during the commission of these offenses. It is possible that the jury, convinced that Overton was a conspirator, found him guilty of the substantive offenses based solely on the erroneous instructions concerning vicarious liability. We are unable to say, as the Court did in *Small*, that the jury found defendant guilty because it found that he had procured the one-act conspiracy. Here we have a multi-act conspiracy; under the instructions given by the trial court, Overton may have been found guilty not because the evidence tended to show that he was involved as an accessory before the fact to the specifically dated offenses, but because he was simply a conspirator, and thus the conviction cannot stand. For defendant Overton, there must be a new trial on the substantive offenses.

In the case of Smedley, there was also error in the trial court's instructions on vicarious liability. Because he was acquitted of all substantive offenses, however, we do not find the error to be prejudicial to him.

Defendant Ruviwat was found guilty of possession with intent to sell and deliver heroin and sale and delivery of heroin, both offenses allegedly occurring on or about 16 October 1975. The record of the trial contains evidence tending to show that the October transaction was part of the Brown Shipment and that Ruviwat's role in this transaction took place in Thailand where he supplied the operation with the illicit drugs. We again are unable to determine whether jury instructions allowed his conviction as a principal in drug activities which, from the evidence, occurred in North Carolina or whether the jury would have found that Ruviwat's earlier involvement in the Brown Shipment would have made him an accessory before the fact. The jury instructions

were, therefore, prejudicial and Ruviwat is entitled to a new trial on the substantive charges.

Atha Atkinson's convictions on the substantive offenses clearly appear to have been based on the jury's reliance on the theory of vicarious liability. The State's evidence tended to involve Atkinson specifically with the conspiracy in June 1974, parts of 1975, and during the summer of 1976. By contrast, the verdicts against the defendant were for substantive offenses occurring in the fall of 1976 and the spring of 1977. From this evidence, we can only conclude that the jury, in finding her guilty of the substantive offenses, relied upon the erroneous instructions on the theory of vicarious liability. Her convictions of the substantive offenses, therefore, must be reversed.

### III

[4] In varying combinations, defendants join to raise questions concerning whether the trial court's instructions adequately applied the law to the evidence. Under G.S. 15A-1232, the trial judge is required to state the evidence which is necessary to explain the application of the law to the particular case. In *State v. Graham*, 194 N.C. 459 at 467, 140 S.E. 26 at 30 (1927), the Supreme Court set forth the following standard which had evolved from G.S. 1-180 (now G.S. 15A-1232):

> Concerning the necessity of declaring and explaining the law it has been held in quite a number of cases that nothing more is required than a clear instruction which applies the law to the evidence and gives the position taken by the respective parties as to the prominent and controlling features which make for the ascertainment of the facts.

The Court is required " 'to explain the law of the case, to point out the essentials to be proved on the one side or the other, and to bring into view the relations of the particular evidence adduced to the particular issues involved.' " *Lewis v. Watson*, 229 N.C. 20 at 23, 47 S.E. 2d 484 at 486 (1948), *quoting* 53 Am. Jur., Trial, § 509.

Defendants Overton, Smedley, and Ruviwat contend that the trial court erred in failing to apply the facts of the case to the law of circumstantial evidence. The trial court's instructions on circumstantial evidence were entirely proper. We find that the court

adequately explained the application of the law to the evidence by its recapitulation of evidence following those instructions. There was no error in this part of the instructions.

Under this same assignment of error, defendant Ruviwat contends that the trial court failed to summarize circumstantial evidence elicited on cross-examination of Herman Jackson that Jackson never saw Ruviwat drive a truck containing heroin to Smedley's house and never saw Ruviwat place heroin in the truck. This evidence was intended only to impeach the earlier testimony of Jackson that Ruviwat obtained the heroin, placed it in a van, and delivered it to Smedley's house. This was not substantive evidence, was not necessary for the application of the law to the evidence; and there was, therefore, no necessity to summarize it in the recapitulation of the evidence. *See State v. Moore*, 301 N.C. 262, 271 S.E. 2d 242 (1980).

Defendants Overton, Smedley, and Atkinson contend that the trial court erred in failing to apply the law of conspiracy to evidence of their cases. After reviewing the instructions in the present case, we conclude that there was no violation of the standard of G.S. 15A-1232. For all the defendants, the trial court recapitulated the evidence (both the State's and the defendants') and explained generally the law of conspiracy as well as the law of the substantive crimes. As to each defendant, the court then instructed the jury as to what it had to find in order to reach a verdict on the conspiracy and on the substantive crimes. This set of instructions parallels that set forth by N.C.P.I. Crim. 202.80, except that the court, instead of explaining the general law of conspiracy for each defendant, explained it only once, at the outset. We find no fault with these instructions. These assignments are overruled.

IV

[5] Defendants Overton and Smedley assign error to the admission of certain evidence. First, they assert error in the trial court's determination that Laura Holmes Smith, who had mental problems and who was under the care of psychiatrist, was competent to testify. The rule on mental competence to testify, set forth in 97 C.J.S. *Witnesses* § 57(b) (1957), was adopted by our Supreme Court in *State v. Benton*, 276 N.C. 641 at 650, 174 S.E. 2d 793 at 799 (1970):

"Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weakminded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue. The decision as to the competency of such a person to testify rests largely within the discretion of the trial court."

In view of these principles and of the pertinent portions of the record set out below, we find no abuse of the trial court's discretion in allowing Smith to testify.

The record discloses that the State initially questioned Smith's competence to testify by filing a motion for continuance and by subpoenaing Smith's psychiatrist, Dr. Louis A. Gagliano. On 15 May 1980, the trial court entered an order finding that, in Dr. Gagliano's opinion, Smith was not capable of testifying. The court ordered that the witness be examined by a psychiatrist selected by the State. Later, defendant Overton moved for a *voir dire* examination to determine Smith's competency. During the trial, prior to Smith's testimony, on *voir dire*, Dr. Gagliano testified that Smith suffered from psychotic depression, that she would have no trouble separating fact from fantasy, that she did have trouble remembering dates, but that, if she could not remember something, "she would probably just tell you that she does not know and be truthful. . . ." Smith, a high school graduate, testified that she understood what it meant to take an oath to tell the truth and that she knew the difference between "truth and untruth." She admitted being confused about the timing of events and having heard voices, but she stated that she had not had any hallucinations in the last few months.

The trial court found that Smith suffered from an emotional disorder, that she had difficulty recalling certain events, especially dates, that she understood the nature of the oath, and that she was able to recall past events and occurrences. The court concluded that Smith was competent to testify. In this conclusion, we find no abuse of discretion. Dr. Gagliano had obviously altered his opinion as to Smith's capability; his chief concern appeared to be the effects of long examinations on Smith's condition and not on her ability to distinguish fact from fantasy. Contrary to argu-

ments by counsel, the fact that Smith *had difficulty* remembering past events is not inconsistent with the court's finding that she could remember those events. These assignments are overruled.

Next, defendants Overton and Smedley argue that the trial court erred in admitting into evidence acts, statements, and declarations of Frank Lucas through the testimony of Wilbur Fuller.[5] Both defendants took numerous exceptions to the trial court's failure to sustain objections to allegedly hearsay evidence. We have reviewed that portion of the record containing this evidence and can find no prejudicial error. First, the evidence was introduced not to prove the truth of the matters asserted and was, therefore, not objectionable as hearsay. 1 Stansbury's North Carolina Evidence § 141 (Brandis' 2d revision, 1982). The trial court so instructed the jury. Secondly, neither defendant has shown this Court any prejudice resulting from this line of questioning. We overrule these assignments of error.

Overton and Smedley make a similar argument about the testimony of Herman Jackson, Herbert Houston, William K. Wright, and others. The defendants allege that the testimony to which they excepted contained hearsay statements made by their co-conspirators, chiefly Ike Atkinson. While they acknowledge the co-conspirator rule — that the acts and declarations of one conspirator, made or done in furtherance of or within the scope of the original conspiracy, may be imputed to other conspirators not present at the time, *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980) — they argue that the statements admitted were narrative statements which are forbidden under *State v. Wells*, 219 N.C. 354, 13 S.E. 2d 613 (1941).

We have reviewed the numerous exceptions set forth by these two defendants. We have found that many do not constitute hearsay, that others were statements in furtherance of the common criminal design and within the *res gestae*, and that none was prejudicial to Overton or Smedley. These assignments are overruled.

---

5. Wilbur Fuller was an attorney representing Herman Jackson and Ike Atkinson during their incarceration in Georgia. He became involved in the sale and delivery of heroin in North Carolina and in New York where he transacted business with Lucas.

Defendants Overton and Atkinson make another common argument about the trial court's admission of evidence. Both assert numerous exceptions to denial of their motions to strike allegedly irrelevant and hearsay evidence. Their argument appears to be that most of the evidence adduced at the long trial was irrelevant as to each of them. This is similar to the argument concerning consolidation of the several defendants for trial, addressed above. While we agree that the evidence was lengthy and that a good portion of it did not relate directly with every defendants' involvement in the conspiracy, we do believe that the evidence was relevant and competent to show the parameters of the conspiracy. The activity of each individual defendant drew significance from an understanding of how this activity related to the actions of others within the conspiracy. That the jurors were not overwhelmed by the large amount of evidence is apparent from the verdicts they returned. We find no prejudice in the admission of such evidence.

V

[6] Defendants Smedley, Ruviwat, and Atkinson contend that the trial court erred when it refused to dismiss count 1 of the bill of their respective bills of indictment. Count 1 in the case of defendant Ruviwat was similar to those of Smedley and Atkinson:

> The jurors for the State upon their oath present that commencing sometime in 1969 . . . and continuing thereafter up through and including March 28, 1978 . . . Luchai Ruviwat, aka Chai unlawfully, wilfully and feloniously with common design and set purpose did . . . conspire with . . . [series of names] to unite for the common object and purpose to unlawfully, wilfully, and feloniously manufacture, possess with intent to sell and deliver, and sell and deliver a controlled substance in violation of the North Carolina Controlled Substances Act. The controlled substance in question consisted of heroin, which is included in Schedule I of the North Carolina Controlled Substances Act.

The defendants argue that, since the Controlled Substances Act was not effective until 1 January 1972, the indictment failed to state a criminal offense under North Carolina law. Additionally, Ruviwat contended that conviction under the Act was effectively a conviction under an *ex post facto* law. We do not agree.

The Controlled Substances Act did not repeal prior law controlling narcotic drugs. The predecessor to the Act was the Uniform Narcotic Drug Act, G.S. 90-86 *et seq.*, which remained in full force and effect as to offenses committed prior to 1 January 1972. *See State v. Harvey*, 281 N.C. 1, 187 S.E. 2d 706 (1972). The conspiracy to possess, sell, deliver, and manufacture heroin was equally a crime under both statutes. Reference in the indictments to the Controlled Substances Act did not invalidate the indictments and reference in the indictment to the specific statute allegedly violated is immaterial. *See State v. Anderson*, 259 N.C. 499, 130 S.E. 2d 857 (1963). Our courts have treated as surplusage to the indictment any incorrect reference to statutes. *E.g. State v. Link*, 13 N.C. App. 568, 186 S.E. 2d 634 (1972).

[7] Defendants Overton and Atkinson make additional arguments concerning the indictments, namely that there was a fatal variance in the evidence adduced at trial. These arguments are based primarily upon earlier contentions that the State's evidence showed numerous conspiracies, not just one spanning the period from 1969 to 1978. We have disposed of these contentions earlier in our opinion and find no need to repeat our discussion on the issue. Defendant Atkinson argues additionally that, since the indictment against her placed her in the conspiracy from sometime in 1969 until 28 March 1978, and since the evidence at trial showed only that she took an active part in the conspiracy in 1974 and at various times thereafter, the State failed to prove its allegations and the motion to dismiss should have been allowed. An argument similar to defendant Atkinson's was made and rejected in *United States v. Bates, supra.* The Fifth Circuit Court of Appeals noted that this argument is premised upon the erroneous assumption that a defendant's relatively late entry into a conspiracy precludes his conviction as a participant in the conspiracy. The court held that a single conspiracy does not become several merely because of personnel changes. We agree with the holding in *Bates*. It is obvious from the lengthy time span set forth in the indictment that the State would have to rely on scattered dates throughout the period to establish defendant Atkinson's involvement. We find no error in the trial court's refusal to dismiss the bills of indictment.

[8] Defendants Overton and Atkinson make a further argument concerning the conspiracy indictments against them, as related to

the trial court's instructions on conspiracy. They contend that, since the indictments alleged conspiracy to manufacture, to possess with intent to sell and deliver, *and* to sell and deliver heroin (the conjunctive), the trial court committed error when it instructed on conspiracy to manufacture, to possess with intent to sell and deliver, *or* to sell and deliver heroin. Since neither defendant was convicted of any of these offenses, such error, if any, was not prejudicial. Defendants' additional argument, that the trial court erred in instructing on the crime of conspiracy to possess heroin, is also rejected. Defendants contend that, since they were not indicted on this charge and since it is not a lesser included offense of the overall conspiracy charge, the trial court should not have instructed that they could be convicted of conspiracy to possess heroin. We disagree with defendants' argument that conspiracy to possess heroin is not a lesser included offense of conspiracy to possess with intent to sell or deliver heroin. In response to an analogous argument, in *State v. Aiken*, 286 N.C. 202, 209 S.E. 2d 763 (1974), our Supreme Court noted that one cannot possess a controlled substance with intent to deliver it without having possession thereof. Similarly, one cannot conspire to possess with intent to sell and deliver a controlled substance without conspiring to possess. We find no error in the trial court's submission of the lesser included offense to the jury.

## VI

Defendants Overton, Smedley, and Atkinson each contend that the trial court erred in denying their motions to dismiss for insufficiency of the evidence. For the reasons noted below, we believe that as to the conspiracy charges, which are our only concern, there was ample evidence to allow the cases to go to the jury.

Upon a motion to dismiss made pursuant to G.S. 15A-1227, the trial court must consider evidence in the light most favorable to the State, giving the State the benefit of every reasonable intendment and every reasonable inference which may be drawn therefrom. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Even so, the State is required to produce substantial evidence more than a scintilla to prove the allegations in the bill of indictment. *Id.* The requirement of substantial evidence is simply a requirement that it be "existing and real, not just seeming or imaginary." *Id.*

State v. Overton

[9]  In the case of Overton, there was evidence tending to show that, as early as 1975, he stored heroin in his home; that in 1976-77, he worked hand in hand with Laura Smith by stashing large amounts of heroin which Smith would later retrieve from Overton for delivery; and that initially he was paid $1,000 per month for his participation. This evidence, viewed in the light most favorable to the State, was more than a scintilla and was clearly ample to withstand defendant's motion to dismiss.

As to Smedley, the evidence tended to show his involvement at the Thailand end of the operation. According to Robert Patterson, Smedley participated in shipping heroin in AWOL bags and in furniture; Thornton testified that he worked with Smedley in securing heroin from Ruviwat (the Brown Shipment). Herbert Houston's testimony tended to show that in 1974 he was paid by Smedley to mail packages containing heroin. Given this evidence connecting Smedley to the drug conspiracy, the trial court acted properly in denying his motion to dismiss.

Finally, there was substantial evidence that Atha Atkinson was working within the conspiracy. In June 1974, according to the State's evidence, Atha Atkinson met with Robert Patterson and accepted two AWOL bags for which she gave him $6,000. Beginning in 1975, she met periodically with Laura Smith who supplied her with bags of heroin for which she paid $100 apiece. There was testimony from George Wynn tending to show that Atha Atkinson was cognizant enough of the overall operation to suspect co-conspirators of attempting to "rip off" her husband Ike. Defendant Atkinson's motion to dismiss was properly denied. Defendants' assignments of error are overruled.

### ISSUES RAISED BY INDIVIDUAL DEFENDANTS

Each defendant brings forward assignments of error peculiar to his own case. We shall discuss those which contain merit and summarize as to each defendant the overall action which we take with regard to his appeal.

### Defendant Overton

[10]  Assigning as error the trial court's denial of his motion to dismiss for failure of the State to bring him to trial within 120 days, defendant Overton emphasizes the 292 day delay between the date he was served with a copy of his bill of indictment and

the date his trial began. G.S. 15A-701(a1)(1) required that Overton be tried within 120 days from the date he was arrested, was served with criminal process, waived an indictment, or was indicted, whichever occurred last. In computing the 120 days, certain periods are excluded:

> . . . .

> (1) Any period of delay resulting from other proceedings concerning the defendant including, but not limited to, delays resulting from:

>> . . . .

>> (d) *Hearings on any pretrial motions or the granting or denial of such motions.*

>> The period of delay under this subdivision must include all delay from the time a motion or other event occurs that begins the delay until the time a judge makes a final ruling on the motion or the event causing the delay is finally resolved;

> . . . .

> (6) A period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted;

> (7) Any period of delay resulting from a continuance granted by any judge if the judge granting the continuance finds that the ends of justice served by granting the continuance outweigh the best interests of the public and the defendant in a speedy trial and sets forth in writing in the record of the case the reasons for so finding. A superior court judge must not grant a motion for continuance unless the motion is in writing and he has made written findings as provided in this subdivision.

>> The factors, among others, which a judge shall consider in determining whether to grant a continuance are as follows:

>> (a) Whether the failure to grant a continuance would be likely to result in a miscarriage of justice; and

(b) Whether the case taken as a whole is so unusual and so complex, due to the number of defendants or the nature of the prosecution or otherwise, that it is unreasonable to expect adequate preparation within the time limits established by this section;

. . . .

G.S. 15A-701(b). Using this formula for computation, we conclude that the State complied with the requirements of G.S. 15A-701 and that defendant Overton's motion to dismiss was properly denied.

From the record it can be determined that, on 25 April 1979, defendant Overton was served with a copy of the original bill of indictment. His trial commenced 11 February 1980. After his indictment, defendant filed numerous motions including four motions to dismiss, motions to require the State to elect and to identify and suppress evidence, a motion for severance, a motion for change of venue, and motions for a bill of particulars, for voluntary discovery, for discovery, and for an extension of time for discovery. These motions began in May of 1979 and continued through the beginning of 1980. With them were filed numerous motions, including motions for extensions of time, by the other defendants; the motions of those appealing their convictions are listed in the record, and we assume that that number is augmented by motions filed by the indicted individuals whose cases are not before this Court.

While we interpret G.S. 15A-701(b)(6) to allow the trial court to deduct from the total period of time any period of reasonable delay which is caused by co-defendants and which is an excluded period under G.S. 15A-701(b), *State v. Shelton*, 53 N.C. App. 632, 281 S.E. 2d 684 (1981), *disc. rev. denied and appeal dismissed*, 305 N.C. 306, 290 S.E. 2d 707 (1982), we find it unnecessary to enumerate the delay chargeable to each co-defendant in the present case. We find that the delay caused by defendant Overton's Motion for Change of Venue, could properly be deducted from the 272 day period and that, with that exclusion, defendant Overton was tried within the statutory period.

Defendant's motion for change of venue was made on 30 May 1979. On 19 December 1979, the trial court entered an order deny-

ing that motion. The G.S. 15A-701(b)(1)d. reference to pretrial motions has been interpreted to include motions for change of venue. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981). In *Oliver*, the Supreme Court stated:

> While motions should be promptly calendared for hearing, both sides are entitled to a reasonable time within which to prepare. We conclude that a motion for change of venue is included within the statutory reference to "pretrial motions." G.S. 15A-701(b)(1)(d). Provided the motion is heard within a reasonable time after it is filed and the state does not delay the hearing for the purpose of thwarting the speedy trial statute, the time between the filing of the motion and its disposition is properly excluded in computing the time within which a trial must begin. The time here between filing and disposition of the motion, 29 days, we find to be a reasonable time. There is nothing in the record to show any purposeful delay on the part of the state.

*Id.* at 41, 274 S.E. 2d at 192. While the period of delay in ruling on the motion for change of venue was considerably longer in the present case than in *Oliver* or *State v. Sellars*, 52 N.C. App. 380, 278 S.E. 2d 907 (*disc. rev. denied and appeal dismissed*), 304 N.C. 200, 285 S.E. 2d 108 (1981) (five months), we cannot, in view of the complexity of the case and the numerous motions made by this defendant as well as his co-defendants, find it unreasonable. When the 292 day period is reduced by the delay necessitated by the motion for change of venue, the total time from indictment to trial is shown to be well within the 120 day limitation.

We would also point out that, upon motion by the State, the trial court granted several continuances. In his order denying defendant Overton's motion to dismiss, Judge Rouse found that "the ends of justice served by granting the continuance [until 11 February 1980] outweighed the best interests of the public and the defendant in a speedy trial, that failure to grant the continuance would have been likely to result in a miscarriage of justice. . . ." Defendant Overton took no exception to this finding. This finding clearly supports the trial court's conclusion that

the defendant was not denied a speedy trial as guaranteed by G.S. 15A-701.[6]

[11]  Defendant Overton also assigns error to the trial court's denial of his motion to suppress evidence concerning his bank account, credit union account, employment records, and telephone records. The record shows that defendant Overton objected to the introduction of such evidence on grounds that his Fourth Amendment right to be free of unreasonable searches and seizures had been violated.

*United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed. 2d 71 (1976) held that a defendant's Fourth Amendment rights were not abridged when, in response to a subpoena *duces tecum*, the records of defendant's bank accounts were disclosed. The Court found that there was no intrusion into any area in which the defendant had a protected Fourth Amendment interest.

> [A depositor] takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . [T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Id.* at 443, 96 S.Ct. at 1624, 48 L.Ed. 2d at 79. The *Miller* court concluded that the defendant lacked the requisite Fourth Amendment interest to challenge the validity of the subpoenas and noted that the banks upon which they were served did not contest their validity.

We find that *Miller* controls the present case. Defendant's contentions that his Fourth Amendment rights were violated when the State obtained an Application for Examination of Records instead of a subpoena *duces tecum* and when it received some records without even this document are meritless. He had no standing to contest the disclosure of the information, and his motion to suppress was, therefore, properly denied.

---

6. Defendant Overton does not contest the trial court's additional conclusion that his Sixth Amendment right to a speedy trial under the U.S. Constitution was not violated.

Defendant Overton brings forward two other assignments of error based upon his conviction of the substantive offenses. We have already determined that there was error in the jury instructions pertaining to those offenses, and we, therefore, find no reason to address the additional assignments of error.

Since the trial court erred in instructing on the theory of vicarious liability, we must remand defendant Overton's case for a new trial free of this prejudicial error. In addition, since the sentence for his conspiracy conviction was consolidated with the sentence for one of the substantive offenses, the case must be remanded for proper sentencing.

## Defendant Smedley

[12]   As his first assignment of error, defendant Smedley contends that, at his first appearance, the district court erred in setting his bail at one million dollars while simultaneously finding him indigent and in need of court-appointed counsel. Defendant cites N.C. Const., Art. 1, § 27 which prohibits excessive bail and G.S. 15A-533 and 15A-534, which require the imposition of a condition of pretrial release in a non-capital case. He argues an interpretation of these provisions analogous to the United States Supreme Court's interpretation of the Eighth Amendment of the U.S. Constitution. *See, e.g. Carlisle v. Landon,* 73 S.Ct. 1179, 97 L.Ed. 1642 (1953), where the Supreme Court allowed an application for bail when it determined that bail with unreasonable conditions attached to it was no bail at all. Smedley claims that the bail set for him was impossible to meet and that it was unreasonable since he was subject to federal incarceration at the time and the State, therefore, would have been able to find him at the time of trial. He further submits that his case was prejudiced by his incarceration in state prisons as opposed to federal prisons because he did not have access to federal prison law libraries for preparation of his defense and he would have had better communication and exercise facilities in federal prisons.

G.S. 15A-534(c) directs the judicial official determining pretrial release conditions to consider any available evidence relevant to the issue, including the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the defendant's family ties, his financial resources, employment, character, and mental condition, defendant's intoxication at

hearing, the length of his residence in the community, his record of convictions and his history of flight to avoid prosecution. Given this list of factors, this Court cannot say that bail of one million dollars was unreasonable. This assignment of error is overruled.

[13] A second question raised by defendant Smedley is whether the trial court properly denied his motion for mistrial after the State, knowing that certain audio tapes could not be admitted into evidence, nevertheless introduced testimony about those tapes. The record shows that James Copeland, Chief Investigator for the Special Narcotic Prosecutors Office of New York City, testified concerning numerous taped conversations between and among drug smuggling conspirators. Upon objection, the trial court refused to admit the tapes into evidence and later refused to strike Copeland's testimony or to order a mistrial.

A trial court's ruling on a motion for mistrial in a criminal case less than capital lies within the discretion of the trial court. *State v. McCraw*, 300 N.C. 610, 268 S.E. 2d 173 (1980). In reviewing the testimony of Copeland and the action of the trial court, we find Copeland's testimony did not directly relate to defendant Smedley and was not prejudicial to him. This assignment is overruled.

[14] Next defendant Smedley argues that the trial court erred in allowing Robert Patterson, William Wright, and Lucian Dobbs, witnesses for the State, to testify about "dope" and "heroin." The basis of defendant's objection is that the State failed to lay a foundation supporting the witnesses' identification of the substance. As to Patterson's and Wright's testimony, defendant's argument must fail for at least two reasons. First, since the same evidence was later admitted without objection, defendant is deemed to have lost the benefit of his earlier objection. 1 Stansbury's § 30. Second, the references by Patterson and Wright were competent to show their state of mind, specifically their belief that the substance being transported in AWOL bags and furniture was heroin. The evidence of their beliefs was relevant to show the conspiracy alleged. *See State v. Smith*, 237 N.C. 1, 74 S.E. 2d 291 (1953). With regard to the testimony of Dobbs, we have reviewed the portions of the record to which Smedley objected; we find no reference to "heroin" or "dope," and conclude that defendant's argument does not pertain to the testimony of that witness.

[15] Defendant Smedley also took exception to the wording of the conspiracy charge as it was set forth on the verdict sheet. The verdict sheet charged, in pertinent part, a conspiracy to "manufacture, possess with intent to sell and deliver *or* sell and delivery of [sic] heroin." The jury's verdict mirrored this use of the disjunctive. Defendant argues that due to the presence of this disjunctive the verdict was ambiguous and cannot stand. In support of this argument, defendant cites numerous cases, all of which are clearly distinguishable from the case at bar.

*State v. Albarty*, 238 N.C. 130, 76 S.E. 2d 381 (1953), is not squarely on point. In that case, the criminal complaint charged that the defendant "did unlawfully and willfully sell, barter or cause to be sold or bartered, any ticket, token, certificate for any number of shares in any lottery commonly known as the numbers or butter or eggs lottery, or lotteries of similar character to be drawn or paid within or without the State against the statute. . . ." The petit jury found the defendant "guilty of lottery as charged in the warrant." In finding the verdict invalid for uncertainty, the Supreme Court noted that the jury verdict made this anomalous finding: "That the defendant is guilty of selling lottery tickets, *or* that the defendant is guilty of bartering lottery tickets, *or* that the defendant is guilty of causing another to sell lottery tickets, *or* that the defendant is guilty of causing another to barter lottery tickets." *Id.* at 133, 76 S.E. 2d at 383 (emphasis in the original).

By contrast, defendant Smedley was charged with conspiracy to deal with drugs. While we acknowledge that the verdict sheet was not artfully drawn, we find it clear that the jury found defendant guilty of conspiracy. The parameters of the conspiracy could include either a conspiracy to manufacture *or* to possess with intent to sell or deliver *or* to sell and deliver heroin. Defendant could not have been prejudiced by the inexact nature of this verdict form because the punishments for conspiracy to do any one of these three offenses are the same, and the trial court's judgment contained a sentence well within the statutory limits. G.S. 90-95. This assignment of error is, therefore, overruled.

[16] As his next assignment of error, defendant Smedley argues that his prosecution by State authorities violated our double jeopardy statute, G.S. 90-97, and that his motion to dismiss on

this basis should have been allowed. Smedley acknowledges that, as a general rule, prosecution and conviction founded on the same set of facts by both state and federal governments is not barred by the constitutional protection against double jeopardy. *State v. Harrison*, 184 N.C. 762, 114 S.E. 830 (1922). He relies solely on G.S. 90-97 which provides in pertinent part:

> If a violation of . . . [the North Carolina Controlled Substances Act] is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this State.

The record shows that, on 15 May 1979, Smedley pleaded guilty to conspiracy to import heroin, a violation of 21 U.S.C. § 963. The question we must answer is whether the conspiracy to import heroin is "the same act" as conspiracy to manufacture, to possess with intent to sell or deliver, or to sell or deliver heroin. We hold that it is not the same act and that G.S. 90-97 was not violated.

The federal law under which defendant was convicted, 21 U.S.C. § 963, defines the punishment for conspiracy to violate Subchapter II, Import and Export, 21 U.S.C. § 951 *et seq.* Under 21 U.S.C. § 952, the substantive offense to which defendant's federal conspiracy charge was related, it is unlawful, with certain irrelevant exceptions, "to import into the customs territory of the United States . . . or to import into the United States . . . any controlled substance . . . " in various schedules, one of which includes heroin. It is obvious from a reading of the definition of this offense, that conspiracy to import heroin pertains to an act different from conspiracy to manufacture, to possess with intent to sell or deliver, or to sell or deliver heroin. It matters not that the two acts are closely related. They are different, and jeopardy under G.S. 90-97 did not attach in defendant's federal case.[7]

---

7. We note also that 21 U.S.C. § 846 sets punishment for conspiracy to commit offenses described in Subchapter I, Control and Enforcement, 21 U.S.C. §§ 801-904. The offenses defined in that subchapter are more closely akin to the offenses for which defendant Smedley was charged by the State. *See* 21 U.S.C. § 841 (manufacture, distribution, possession with intent to distribute). In *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed. 2d 275 (1981), the Supreme Court held that convictions and separate consecutive sentences received for conspiracy to import marijuana (21 U.S.C. § 963) and conspiracy to distribute marijuana reflected Congressional intent and did not violate the Double Jeopardy Clause. The Court

[17] Defendant Smedley argues further that it was error for the trial court to deny his motion to depose Frank Lucas, a co-conspirator who, at some point, had agreed to work with authorities in New York. Defendant, however, cites no constitutional, statutory, or case law basis for his contention. Frank Lucas did not testify for the State; at the time of trial, he was confined at the New Jersey Department of Corrections. If defendant Smedley had wanted Lucas' testimony at trial, he had an appropriate remedy under G.S. 15A-822. This assignment of error is overruled.

[18] One final assignment of error by defendant Smedley warrants discussion. In that assignment he contends that the trial court erred in denying his motion challenging the jurisdiction of the North Carolina trial court. The basis of his motion was that, since he was acquitted of the substantive offenses which occurred in North Carolina and since the State's evidence tended to show he entered the conspiracy while living in Thailand, there were no grounds for jurisdiction. We disagree. Our courts have jurisdiction over those involved in a criminal conspiracy if any one of the conspirators commits an overt act in furtherance of the conspiracy within the State, even if the unlawful conspiracy was entered into outside the State. *State v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334 (1964), *cert. denied*, 377 U.S. 978, 84 S.Ct. 1884, 12 L.Ed. 2d 747 (1965).

The remaining assignments of error brought forward by defendant Smedley either are contingent upon his success in earlier arguments or contain no merit. Consequently, in defendant Smedley's trial, we find no error.

### Defendant Ruviwat

[19] Defendant Ruviwat brings forward only one argument which is not raised by one or more of the other defendants. He assigns error to the trial court's revocation of an order granting him, a Thai national, the assistance of an interpreter. We have reviewed the record and find no error in the trial court's decision.

noted that Sections 846 and 963 specify different ends as the proscribed object of the conspiracy and that each provision requires proof of a fact not required for the other.

State v. Overton

The record reveals that the trial judge (Smith, J.) and the superior court judge hearing the motion for an interpreter (Rouse, J.) both agreed to the appointment of an interpreter, at State expense, to aid the indigent defendant. Later, after observing defendant in the courtroom and after a hearing, Judge Smith revoked that appointment. The order appointing the interpreter was interlocutory and could be altered upon a showing of changed circumstances. *See State v. Turner*, 34 N.C. App. 78, 237 S.E. 2d 318 (1977). In his order, denying defendant the right to an interpreter, Judge Smith found that defendant had eight years of education related to reading and writing English and that he had sufficient understanding of the language to enable him to confer with his attorney and assist in his own defense. To these findings, defendant took no exception. They support the trial court's order denying Ruviwat an interpreter. This assignment is overruled.

### Defendant Atkinson

[20] Defendant Atkinson assigns as error the trial court's admitting into evidence statements made by her spouse, Ike Atkinson. The record shows that, prior to trial, defendant Atkinson made a motion for severance on the basis that statements made against the other defendants by Ike Atkinson would be inadmissible as to her under the provisions of G.S. 8-57 and that severance would, therefore, be necessary for a fair determination of her guilt or innocence. Defendant also filed a motion *in limine* to prevent the introduction of such evidence. Both motions were denied. Throughout the trial of her case, defendant Atkinson objected to the introduction of evidence pertaining to her husband's statements and criminal activities.

G.S. 8-57 provides in pertinent part that "[n]othing herein shall render any spouse competent or compellable to give evidence against the other spouse in any criminal action or proceeding," with certain stated exceptions.[8] This portion of the

---

8. The Supreme Court case of *State v. Freeman*, 302 N.C. 591, 276 S.E. 2d 450 (1981), modified the common law rule embodied in G.S. 8-57 and held that spouses are incompetent to testify against one another in a criminal proceeding *only if* the substance of the testimony concerns a confidential communication between the spouses during the duration of their marriage. Although an application of this ruling would clearly defeat defendant Atkinson's claim, we read it as being prospective only and not applicable to this case which was tried before *Freeman* was filed.

statute has been interpreted to prohibit the admission of evidence of statements made by one spouse implicating the other. *See State v. Dillahunt*, 244 N.C. 524, 94 S.E. 2d 479 (1956). As pointed out by the State, however, G.S. 8-57 is a codification of a common law rule of evidence, *State v. Freeman*, 302 N.C. 591, 276 S.E. 2d 450 (1981), and, as such, is subject to the same exceptions which pertain to the common law rule. One of the exceptions is that, when one spouse is made the agent of the other spouse, the statements of the agent are admissible against the principal despite the spousal relationship. *State v. Lemon*, 92 N.C. 790 (1885). We believe this is analogous to the situation involving co-conspirators who are spouses and that it controls the issue before us. In addition, we would note that none of the numerous exceptions taken by defendant Atkinson pertained to evidence related to her or to her involvement in the conspiracy. There has been no prejudicial error, and this assignment of error is overruled.

[21]   Defendant Atkinson also assigns error to the refusal of the trial court to allow evidence of her involuntary commitment and hospitalization records. Evidence at trial tended to show defendant Atkinson's involvement in the conspiracy in June 1974, during parts of 1975, and the summer of 1976. The records of commitment showed that she was in the hospital from July 22, 1976, to October 16, 1976, from March 23, 1977, to March 31, 1977, and from April 2, 1977 to June 6, 1977. We agree with the State that such evidence had no logical tendency to prove or disprove any fact in issue and was, therefore, irrelevant. This assignment of error is overruled.

[22]   Finally we review defendant Atkinson's argument that the trial court erred in denying her request for instructions that her mere subsequent possession of the proceeds of her husband's crimes is not sufficient to establish an agreement between them to commit the crime. In support of this argument, defendant cites the case of *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954), where the Supreme Court noted that conspiracies cannot be established merely by evidence of association which is "normal for persons living in the marital state." This argument, however, overlooks the clear evidence showing that Atha Atkinson was a participant in the conspiracy: her pick-up of drugs, her purchase of heroin from Laura Smith, and her knowledge of problems with money within the conspiracy. Under this evidence, defendant's re-

State v. Overton

quested instructions were not required and the trial court proper-
ly refused to give such instructions. This assignment is overruled.

We have reviewed the remaining assignments of error
brought forward by defendant Atkinson, and in those assignments
we find no error. Due to the court's instructions on vicarious
liability, however, we reverse defendant Atkinson's conviction of
the substantive counts. Her conviction for the conspiracy must
stand, but, because her sentence for this crime was consolidated
with the crime of possession, we must remand for re-sentencing
on the conspiracy alone.

The results are:

For error in defendant Overton's trial for possession,
manufacture, and sale or delivery of heroin, there must be a

New trial.

In defendant Overton's trial for conspiracy, we find

No error, but remand for resentencing.

In defendant Smedley's trial for conspiracy, we find

No error.

For error in defendant Ruviwat's trial for possession and sale
or delivery of heroin, there must be a

New trial.

In defendant Ruviwat's trial for conspiracy we find

No error.

Defendant Atkinson's convictions for possession, manufac-
ture, and sale or delivery of heroin are

Reversed.

In defendant Atkinson's trial for conspiracy, we find

No error, but remand for resentencing.

Judges HEDRICK and ARNOLD concur.